# Eloise Roman, Devisee and Executrix of J. Philip Roman *vs.* Hippolyte Mali.

*Parties in Pari Delicto—Different degrees of Guilt as between the Parties to a Fraudulent transaction—Relation of Attorney and Client existing between Parties in Pari delicto—Transactions between Attorney and Client to be rigidly scrutinised—What is required of a Party seeking the Aid of a Court of Equity—When the Re-argument of a Case will be allowed.*

A bill was filed against a devisee to compel her to convey to the complainant certain real property, the legal title to which was held by her testator at the time of his death. The bill alleged in substance, that the testator acquired the title to the property in the capacity of agent and legal adviser of the complainant, and that he paid for it with the money of the complainant and held it as his agent and trustee from the time of the purchase until his death. The evidence in the case, in the opinion of a majority of the Court, showed that in the transfer and concealment of the property of the complainant in the name and apparent ownership of the testator, a gross fraud was perpetrated upon the creditors of the former; that the whole transaction was the joint scheme of the two—the one co-operating with the other and both being equally guilty—to withdraw and conceal the complainant's property from the pursuit of his creditors; that the object was accomplished, and the complainant got rid of his creditors by a composition founded upon his fraud and deception. Held :

That the complainant could not obtain the aid of a Court of Equity to have the property restored to him.

There may be different degrees of guilt as between the parties to a fraudulent or illegal transaction; and if one party act under circumstances of oppression, imposition, undue influence, or at great disadvantage with the other party concerned, so that it appears that his guilt is subordinate to that of the defendant, the Court, in such case, will relieve.

Where the parties to a fraudulent or illegal transaction are *in pari delicto*, the simple fact, that at the time of such transaction, the relation of client and attorney exists between them, will give the former no claim to the aid of a

Court of Equity to have restored to him the property of which the latter has become possessed by their joint fraud. Such relation alone will not except the case from the general rule, *in pari delicto potior est conditio possidentis, aut defendentis.*

An attorney is under no actual incapacity to deal with or purchase from his client. All that can be required is, that there has been no abuse of the confidence reposed; no imposition or undue influence practiced, nor any unconscionable advantage taken by the attorney of the client. When a transaction between parties occupying such relation to each other is brought in question, the onus of the case is cást upon the attorney of showing that nothing has happened in the course of the dealing which might not have happened had no such connection subsisted, and that the transaction has been fair in all respects. If the Court be satisfied that the party holding the relation of client performed the act or entered into the transaction voluntarily, deliberately and advisedly, knowing its nature and effect, and that no concealment or undue means were used to obtain his consent to what was done, the transaction will be maintained.

He who comes into equity must come with clean hands; and if a party seek to cancel or set aside an instrument, or be relieved of a transaction, or recover property, on the ground of fraud, and he himself has been guilty of a wilful participation in the fraud, equity will not interpose in his behalf.

No re-argument will be granted unless some member of the Court who concurred in the judgment, doubts the correctness of his opinion, and desires a further argument on the subject, and not then unless the proposition receives the support of a majority of the Judges who heard the case; and when that happens, the Court will of its own accord, apprise the counsel of its wishes, and if it does not desire to hear further argument on the whole case, will designate the points on which it desires to hear them.

APPEAL from the Circuit Court of Baltimore City.

The bill of complaint in this case was filed by the appellee on the 23rd of June, 1871, against the appellant. The opinions in the case, together with the argument of the appellant's counsel, furnish, it is thought, a statement of the case sufficient to illustrate the points decided by the Court. The Court below (PINKNEY, J.,) being of opinion that the complainant was entitled to the relief as prayed, decreed on the 20th of February, 1874, that J. Philip

Roman, deceased, held the property situated at Locust Point, in the city of Baltimore, in "trust for the use and benefit of the complainant, from the date of its sale by George H. Williams, Esq., on the 13th of March, 1855, until the death of said Roman, and that since his death, the defendant hath held and now holds the said property in like manner, in trust for the use and benefit of the said complainant, subject, however, to the result of the account to be hereafter taken." It was further decreed that "the cause be referred to the auditor of the Court to state an account between the parties in accordance with the principles established and declared in the opinion of the Court, of and concerning all moneys of the complainant used by the said J. Philip Roman, in the purchase and improvement of said property, and in paying the expenses incident to the possession and management thereof, and of and concerning any of his proper fees, charges or other compensation for professional or other services rendered by him in respect to or in connection with the said property and trust, and all rents and profits of said property received by said Roman, in his life-time, and by the defendant since his death, and of and concerning all payments and disbursements made by said Roman, in his life-time, and by said defendant, since his death, for and on account of the rents, issues and profits thereof."

It was "further ordered, that the balance (if any) found to be due to the defendant, as executrix, or in her own right, upon the statement of said account, should constitute a lien upon said property and upon the rents, issues and profits of the same in the hands of the Receivers hereinafter appointed." William A. Fisher and George H. Williams, Esquires, were appointed Receivers to take charge of the property and receive and collect the rents, issues and profits thereof, &c.

By the decree the defendant, her servants, agents and attorneys were enjoined and prohibited from interfering,

in any way, from and after the appointment and qualification of the Receivers, with said property or with the rents, issues and profits thereof, until the further order of the Court.

From this decree the defendant appealed.

The cause was argued before BARTOL, C. J., STEWART, BOWIE, BRENT, MILLER, ALVEY and ROBINSON, J.

*George H. Williams* and *I. Nevett Steele*, for the appellant.

The case of the complainant is claimed to be founded on a resulting trust in his favor, arising from the alleged payment by him of the purchase money for the property in controversy. It is well settled that such a trust can only result from the fact of the payment of the purchase money by the party claiming, or with his money, and from no other facts. For the safety of recorded titles, to prevent the evasion of the Statute of Frauds, and to avoid the risk of perjury, Courts of Equity have laid down stringent rules as to the proof which they will require for the establishment of the fact of such payment. The evidence must be clear and certain, so that no reasonable doubt as to the fact can remain in the mind of the Court; it must go directly and distinctly to the fact, and is insufficient, if it be contradictory or conflicting. *Dorsey vs. Clarke,* 4 *H. & J.,* 551-6-7 ; *Faringer vs. Ramsay,* 2 *Md.,* 365, 374-5 ; *Hollida vs. Shoop,* 4 *Md.,* 474-5 ; *Greer vs. Baughman,* 13 *Md.,* 257, 268-9 ; *Mutual Ins. Co. vs. Deale,* 18 *Md.,* 26, 46 ; *Purdy vs. Purdy,* 3 *Md. Ch. Dec.,* 547 ; *Prevost vs. Gratz,* 6 *Wheaton,* 498 ; *Hill on Trustees,* 94, 105.

The rules established by these cases apply with special force and strictness to resulting trusts and alleged frauds, sought to be made the ground of claim after long lapse of time, and after the death of the person upon whose acts the claim is founded. In this case, not only do we

find these circumstances, but it is to be observed that here the Court is called upon to establish and set up a resulting trust against the record title, when it can do so only by disregarding and setting aside papers executed under the hand and seal of the complainant, and which are admitted to be in all respects what he meant they should be—by annulling the action of the Superior Court sitting in Equity, in a case in which the complainant and J. P. Roman were parties,—and by setting up a trust in favor of complainant, when he himself in a judicial proceeding has sworn that there was no such trust.

The complainant having been a party defendant in the case in the Superior Court, for the sale of the Locust Point property ; the sale made in that case to J. P. Roman and J. D. Roman, having been ratified by the Court—the bill having alleged that Roman, the complainant in that cause, was the owner of the mortgage notes of Jewett to the Ellicotts, and Mali having admitted the fact by his answer ; Mali having also assented to the ratification of the auditor's account, in which these notes and the mortgage notes of Jewett to Mali were audited to Roman—and the latter notes having been so audited on the oath of Mali himself, that he had transferred them for valuable consideration to Roman, Mali is estopped from averring anything in contradiction of the record in that case ; on the ordinary principle of *res judicata*, he could not again open and deny matters settled by that record, and much less can he do so, when the foundation of the Court's action was his own admission on his own oath. *Wilson vs. Watts,* 9 *Md.,* 356 ; *Railroad vs. Howard,* 13 *Howard,* 336-7.

The evidence relied upon to prove the payment of the $46,000 purchase money, by Mali or with his money, is utterly insufficient under the rules on that subject already referred to. It not only does not prove that fact clearly and certainly, but does not prove it at all.

The evidence consists of correspondence and parol testimony by the witnesses, Spates, O. P. Jewett and Clarence Jewett, as to the declarations of Roman, save the alleged accord of figures in Roman's books, which will be specially and separately considered. These declarations are excepted to, and are believed not to be admissible, but taking all the evidence together, it is contradictory, conflicting, vague and uncertain.

Admissions of Roman as to the fact of the payment of the $46,000 with Mali's money, going directly and distinctly to that fact, might be properly considered by the Court, but the declarations offered in evidence are not of that character. Statements that the property was bought on account of or for Mali, or that it was Mali's, would go to prove a conventional trust by parol, and are not admissible or to be considered, for the purpose of inferring from them such payment of the purchase money.

It will be found, that so far as the correspondence offered in evidence by the complainant is concerned, it proves nothing, except great intimacy between Roman and Mali, and connection of some kind between them in some business matters.

If it be sought on the part of the complainant, to rely on the so-called admissions of Mr. Roman, the defendant may well and exclusively rely on the express admissions of the complainant, solemnly made under oath in judicial proceedings.

So far as the parol evidence refers at all to the use of Mali's money in connection with this property, it would rather go to show that his money, if used at all, was used in the extinguishment of liens on the property, and intended in that way to be concealed and put beyond the discovery or reach of the creditors of Mali. No witness states that Roman admitted that the purchase money was paid with Mali's money, and it is to be observed that the bill itself does not make any such distinct allegation, but

alleges that if money was advanced by Roman, it was afterwards refunded.

The question whether there was money of Mali's in Roman's hands, is secondary, and only important, if followed up by proof, that such money was used to pay the purchase money of the Locust Point property ; but in fact, the evidence no where shows money of Mali's in Roman's hands, prior to the institution of the Equity proceedings in the Superior Court ; and the mortgage notes of Jewett to Ellicott were then already purchased by Roman.   On the contrary, the money that was to come to Roman's hands, according to Spates' testimony, was not to be received until after the purchase had been made.

Whether the purchase money was paid in cash as the decree required, or was paid by the credits to Roman in the auditor's account, there is no proof that it was Mali's money.

All the papers in the case executed by Mali—his admissions and affidavit in the Superior Court case—his sworn answer in the New York Equity proceedings—his answer to searching interrogatories propounded to him in a judicial proceeding in New York—all conclusively negative the idea, that Mali had any interest at that time in the Locust Point property.

It is submitted, with confidence, that the foundational fact—the payment of the purchase money by Mali, or his money—has not been established at all, and certainly not proved with the clearness, certainty, distinctness and precision which the law requires.

The party seeking to recover on the ground of an alleged fraud, must himself come into Court with clean hands. Are the hands of the suitor clean, who can only become entitled to relief, by holding him to have been guilty of perjury ?   In this case the property was not Mali's at the time of the sale and purchase ; as owner, he then had no

Roman, Devisee, &c. *vs.* Mali.

interest in it; the only interest he ever had as owner was one-half, and that interest is now conceded to him. As to the purchase of the other half, Mali cannot claim it on any other ground, than that Roman bought it and paid for it with Mali's money.

It seems to be clear that the money of Mali's which it is alleged was to come into Roman's hands, was to come there for the purpose of delaying and hindering the creditors of Mali. Mrs. Roman consenting to let Mali have one-half the property, in accordance with the testamentary letter left by her husband, has under all circumstances of this case thought it proper to rely on the defence, that Mali can not recover the other half of the property; because his money, if put in Roman's hands, was put there to defraud his creditors.

The cases in Maryland fully establish the public policy on which this defence is founded. In this case the very object of the bill, is to get the Court to carry into effect the alleged occult fraudulent agreement, and is therefore the very case to which the defence is rigorously applied.

It is said that the defence cannot be maintained in the case, because in this matter Roman was the counsel or attorney of Mali. It is believed that the evidence does not establish this. The truth is, Mali is the person who was to be benefited by the concealment of his property; he, according to the evidence of Spates, was apprehensive that his creditors might get at his property, while Roman was always of opinion that the creditors could not get judgment, and Mali selected Roman as the person to hold and invest his money, not as an attorney, or because he was an attorney, but as his, Mali's friend, in whom he had confidence. In all cases where this defence has been maintained, this same confidence will be found to have existed. Even if this relation of attorney and client did exist in this case, and the law in such case would not permit the attorney to make this defence, if there were

nothing more in the case; yet it is submitted, that whereas, in this case, the complainant has maintained his fraudulent arrangement, and obtained the benefit of it, by his own perjury, public policy emphatically requires that the defence should be maintained; otherwise the Courts would be holding out a premium for perjury. *Freeman vs. Sedwick,* 6 *Gill,* 28; *Stewart vs. Iglehart,* 7 *G. & J.,* 132; *Bayne vs. Suit,* 1 *Md.,* 86; *Cushwa vs. Cushwa,* 5 *Md.,* 44; *Wilson vs. Watts,* 9 *Md.,* 356; 1 *Story's Eq. Juris.,* sec. 298.

But to affix Roman with an implied trust, it is vital to show, that at the time of the purchase he had Mali's money wherewith the payments were made. Now had he any such money at that time?

It appears from Ledger No. 1, now in evidence, and by other evidence in the cause, that the amount of money, paid out by Roman for Mali, far exceeded the amount received. And it further appears that at the time when the entry of $94,000 (round numbers) was made in or about the year 1859, $55,000 (round numbers) of the $101,000 had been already expended for Mali, leaving in the hands of Roman but about the forty-six thousand dollars of Mali's money to pay for Locust Point, and to meet the other very heavy advances made by Roman from time to time.

And it is of course to be observed that this entry of $94,000, which *is* relied upon by the other side, and which is the first entry if it be taken to refer to Locust Point, which makes any charge against Mali, for that property, is not made until four years after Locust Point had been purchased, and was made at a time when Roman had not enough of Mali's money to pay one-half of that amount.

It is therefore clear from the entry itself, as found in the book, that Mali's money could not at most have paid

for more than *half* of Locust Point.   But if it could be shown that Roman had enough of Mali's money to buy for him half of Locust Point, that does not prove he did it or agreed to do it.

Now as to the accord of figures.   The learned Judge in the Court below has said that after the introduction of Roman's books it "has made the existence of the trust too plain for controversy."   This opinion is based upon the fact that in Roman's Ledger he has charged Mali with an item of figures, which exactly accord in amount with the aggregate of the charges made up to that date in the same book by Roman against Locust Point, and because of this exact accord it is argued that an irresistible inference arises that they mean one and the same thing, and that the establishment of the trust thereby is "too plain for controversy."

That this accord is a strange coincidence, and that upon it the complainant can found a strong argument is not to be denied, and nothing herein stated is designed to deny the fairness or strength of this argument, unless this accord can be fully explained by other and undoubted figures in the proof.

This accord was discovered late in the progress of the cause, and at the hearing the surprise was such to the defendant's counsel that they were not prepared at the moment to explain it as they now do.

In the inner column of the entry on the Ledger will be found the figures $89,754.59 ; these seem to have been formerly extended for that amount, and then erased, and then extended as $94,443.77.   The debits against Locust Point exactly add up $94,443.77, hence the accord and "the irresistible inference."

Now whatever strength there may be in this accord the other item of $89,754.59 accompanies it, and was origi- nally intended for it.   What explains the one should

explain and show a connection with the other; if this cannot be done then there goes an element of weakness with this strength, and destroys in great part, if not in whole, the effect of this accord. And on the other hand, if other and different figures in the case, referring to other matters, explain the accord, or rather in like manner accord not only with the one set of figures, but the other set also, then this irresistible inference which makes the trust "too plain for controversy," melts away. Now no connection or explanation can be given of the $89,754.59 by any additions on Roman's Ledger.

What ascertains the accord of $94,443.77 by that Ledger sheds no light on its companion $89,754.59, for which it has been manifestly substituted, and the irresistible inference is clogged with this diminution of its strength as proof; they cannot be separated, and what so perfectly establishes the one, as is supposed of necessity should be shown at least to have *some connection* with the other. That this Ledger on the complainant's theory will show any connection whatever between these two sums will not be pretended.

Attention is now solicited to the following undisputed figures in the cause :

Cash for the one-ninth of the Totten estate......$ 2,960 00
Cash for the 1st Totten bond........................... 17,759 02
Cash on the 2nd Totten bond ....................... 34,819 75
Cash on notes P. V. Co., assigned to Roman... 17,750 00
Cash on notes endorsed by H. M. to J. P. R... 21,156 60

$94,445 37
Omit the 60 cents, and with an error of a dollar in addition............................................ 1 60

And you have the exact accord....................$94,443 77

Then—

| | | |
|---|---|---|
| Cash on 1st Totten bond | 17,020 | 10 |
| Cash on 2nd Totten bond | 34,819 | 75 |
| Cash for note assigned by H. M. to R. | 20,156 | 60 |
| Cash for note assigned by H. M. to R. | 17,750 | 00 |
| Cash on the $2,960 cheque was given for a protested draft, (protest and interest increased it to $2,960,) and it must have been less by | 8 | 89 |

89,755 34

Omitting the 75 cents in the amount, $34,819.75     75

The exact accord with the remaning item as erased .....................................................$89,754 59

Now, whether these debits were correctly made by Roman as proper charges is not the question, we are not just here justifying the propriety of charges. We are explaining an accord of figures in Roman's books, made by him for his private use, and composed of items as he chose to charge them. Right or wrong he made them, and careless and rough as he seems to be in figures the question is, do they not explain away these supposed irresistible inferences?

But it is submitted that the complainant, if he relies upon the book at all, must take it as a whole and as he finds it. He cannot use as much as suits his purpose and ignore the residue. What then is to be done with those pages which set forth Roman's investments, among which his investment in Locust Point is registered so prominently; all the pages must be taken together; you cannot read and rely upon one page and ignore all others; and so Roman went to his grave, without contradiction by the complainant in his life-time, with this investment in Locust Point, set down with his other investments.

Was Roman the solicitor or counsel of Mali at any time, save in the one case in 1854? There is no proof of fee

paid or charge for professional services. Mali had seven lawyers in New York, and not one was produced to show that Roman was at any time their colleague, or that he ever opened his lips to them—nay, it is proved that, though present at the trial of one of Mali's suits, he did not go to the trial table, and such references as he casually found, to authorities he gives to Mali, and does not have any intercourse with any of the counsel there present, so far as the proof shows ; Spates, who assumes to be the great manager of these suits, could not say, when asked, that Roman ever had a consulting interview with any of these counsel. And yet these were the important suits, so tremendous in their consequences to Mali and his confrére, Jewett.

Roman was a director in the Parker Vein Co., and its attorney at the time of the matters complained of, and probably a good witness, but where is the proof that he acted as the solicitor or counsel? If even the recognized adviser of Mali, to any extent, why does he thus write to Mali, "but perhaps, my dear friend, I am going too far in advising you." If legal adviser, in any sense, would or could he have so written? We submit that friend he was, but legal adviser never. And this agrees with the New York evidence, which at least is true to the extent that Roman was proved not his legal adviser—however it may be as to other matters—but can this question, in the face of that proof, be considered?

Will a Court of Equity, at the instance of Mali, indulge him by saying the relation of counsel and client existed between them when Mali has repeatedly sworn in another Court, that this relation did *not* exist between them? Will it gratify him in his demands, and consummate the purpose for which all this false swearing is supposed to have been given, and so reward a man for swearing falsely in a Court of Justice to accomplish the nefarious end of concealing his property from his creditors?

*Charles Marshall* and *S. Teackle Wallis*, for the appellee.

The evidence in this case clearly establishes the fact, that Roman bought and held the Locust Point property for Mali. And this being established, we may consider the final issue, and in fact, the only issue in the case. That issue is as follows :

The respondent pleads that her husband bought and held Locust Point for Mali, under an illegal arrangement between them to defeat the suits of certain persons in New York against Mali, and invokes for her protection in holding the property, the rule of law that as between parties to an illegal arrangement of this kind, standing *in pari delicto*, the Court will refuse relief. This defence admits all that we claim as to the purchase and holding of the property by Roman for Mali.

We reply to this defence as follows :

1st. That whatever illegality there was in the transaction, Roman was the counsel and adviser of Mali, and all that was done, was done under Roman's advice as counsel.

2nd. That Roman constantly advised Mali that the claims of the New York suitors were unfounded, and could never be established, that the suits were intended only to levy black-mail, and that if Mali would put himself and his property in his (Roman's) hands, he would protect him and his property, and secure him against these unjust and unfounded demands.

3rd. That Mali confided in this advice, and did put himself and his property and affairs, without reserve, in Roman's hands, as his counsel and legal adviser, believing, under the advice he had received, that he had the right to resist and defeat these demands in the way suggested by Roman, and implicitly obeyed all directions of Roman.

4th. That Roman, as Mali's counsel, assumed the direction of the suits against Mali, and took charge of all his property and affairs.

5th. That under Roman's management, the suits resulted in judgments against Mali, and thus furnished Roman with the means of setting up the defence of illegality in order to retain Mali's property.

6th. That Roman colluded with the parties who sued Mali in order to provide this very defence for himself, and thereby acquire all of Mali's property, and that in all that Roman advised Mali to do, his design was to lead him into a position which would enable Roman to hold on to the property on this infamous plea.

7th. That while conceding the truth of the general principle, that as between parties *in pari delicto*, no relief will be given by the Courts, that rule has no application to a case where the party, seeking to avail himself of it, stands in the relation of counsel and legal adviser of the other party.　That when a lawyer advises his client to do an illegal act, by which the lawyer gets possession of his client's property, a higher and more imperative rule of public policy demands that the Court shall not sanction the infamous act of one of its own officers.

To meet this answer to her plea of the illegality of the arrangement between Roman and Mali, the respondent utterly denied that in all these transactions, the relation of counsel and client existed between Roman and Mali.

That Roman was the counsel of Mali in the proceedings which resulted in the acquisition by the former, of the title to the Locust Point property, is abundantly established by the evidence.　There can be but little doubt that the case must depend upon the answer which the Court will give to this question :

Can a lawyer, a member of the Maryland bar, persistently advise his client dishonestly for years ; can he lead him into devious paths ; can he assume complete control of all his affairs, and by his advice and influence acquire all his property, in fraud of his client's creditors, and in fraud of his client, and when called to account for it, can

he shelter himself behind his own falsehood and treachery by pleading the illegality of acts done under his own advice and professional direction?

The truth of the maxim of law invoked by the appellant—"*In pari delicto, potior est conditio defendentis, aut possidentis,*" is conceded; and in a case where the parties to such a transaction as is disclosed in this case stand in *pari delicto,* that rule should be applied. But Courts of Equity and of Law do not apply this rule invariably, but the parties must be *strictly in pari delicto.* The Court will weigh the degrees of guilt, and will give relief when the party seeking it is less to blame than the other, or when it appears that one party may have *acted under circumstances of oppression, imposition, undue influence, or great inequality of condition, so that his guilt may be far less than that of his associate in the offence.*

Apart from Roman's position as the trusted friend and legal adviser of Mali, the evidence shows that he actually possessed unbounded influence over him.

The power of an attorney over his client in Maryland is almost unlimited. He can bind him as to third parties, and the client has no relief *except against the attorney,* if the latter injure him. *Bethel Church vs. Carmack,* 2 *Md. Ch. Dec.,* 143.

The advice of an attorney, honestly followed by his client, will protect the latter in a suit for malicious prosecution, although the advice may be erroneous.

It is surely against public policy that a man be arrested and prosecuted for an offence of which he is innocent, and yet so sacred is the relation between counsel and client, and so essential is it for the public good, that clients may confide in and follow the advice of their counsel, that even in a case of false imprisonment, a higher and more imperative rule of public policy demands that they shall be protected, even when they have wrongfully arrested and prosecuted an innocent man. This Court has laid down

the rule of policy applicable to persons standing in relations of confidence to each other, in the strongest terms. *Todd vs. Grove*, 33 *Md.*, 143 ; *Story's Eq. Ju.*, *secs.* 310 *to* 312 ; *Perry on Trusts*, *secs.* 202, 203, 205 *and* 846 ; *Story on Agency*, *sec.* 302.

For the honor of our profession, we claim that in this case there is no room for the application of the rule invoked by the respondent, to enable her to retain property to which her husband certainly had no right. See the following authorities : *Hill on Trustees*, 164 ; 1 *Story's Eq. Ju.*, *secs.* 298—308 *inclusive* ; *Perry on Trusts*, *secs.* 202, 214 ; 1 *Fonblanque's Eq.*, *book* 1, *ch.* 4, *sec.* 4, *note* 7 ; *Lester and Wife vs. Howard Bank*, 33 *Md.*, 558 ; *Freeman vs. Sedwick*, 6 *Gill*, 29 ; *Kerr on Injunctions*, 51, 52, *top* ; *Williams vs. Bailey*, 1 *Law Rep.*, *H. of L.*, 200, 212 ; *Smith vs. Bromley*, *Douglas*, 696 ; *Browning vs. Morris*, *Cowper*, 790 ; *Osborne vs. Williams*, 18 *Vesey*, 379 ; *Morris vs. MacCullock*, 2 *Eden*, 191, 192 ; *Law vs. Law*, 3 *P. W.*, 392 ; *Hatch vs. Hatch*, 9 *Vesey*, 295 ; *Roche vs. O'Brien*, 1 *Ball & Beatty*, 358 ; *St. John vs. St. John*, 11 *Vesey*, 535 *and* 536 ; *Reynell vs. Sprye*, 1 *DeG. Man. & G.*, 660 ; *Smith vs. Bruning*, 2 *Vernon*, 392.

See also the following cases in the Supreme Court of the United States : *Harris vs. Runnels*, 12 *Howard*, 79 ; *Walworth vs. Kneeland*, 15 *Howard*, 353–4 ; *Udell vs. Davidson*, 7 *Howard*, 769.

These latter cases show that the party who endeavors to retain property or to defend himself when sued, by the plea that the transaction *is against public policy, has no right of his own, which is protected like rights resting on contract, but only enjoys immunity by reason of the disability to sue, which the policy of the law imposes on his adversary.* If the policy of the law require that the *defendant shall be punished,* the Courts will punish him, although by so doing they may confer an advantage upon a less guilty party. But the precise question in this case

has been decided by the Court of Appeals of New York. *Ford vs. Harrington*, 16 *N. Y.*, 285. This case was followed by *Freelove vs. Cole*, 41 *Barbour*, 318, and by the very recent case of *Goodenough vs. Spencer*, 2 *N. Y. Sup. Ct. Rep.*, 508, which is a case in which the client, as in this case, had been examined under proceedings supplementary to judgment, and had answered as in this case Mali did. *See also Bulkley vs. Wilford*, 2 *Cl. & Fin.*, 177, *and* 8 *Bligh, N. S.*, 11.

Another principle is applicable to this case. It is settled that in cases where the defence of illegality is taken by a party to the illegal transaction, "if the foundation of the suit be something collateral to the illegal contract or transaction, and the plaintiff is not obliged to resort to this in order to maintain the suit, or to derive any aid from it, then the illegality of the original transaction is not a defence to the suit." *State vs. the B. & O. R. R. Co.*, 34 *Md.*, 364; *Kerr on Injunctions*, 52, *top page; McBlair vs. Gibbes*, 17 *Howard*, 232; *Watts vs. Brooks*, 3 *Vesey*, 612; *Brooks vs. Martin*, 2 *Wallace*, 70.

In the present case, the original arrangement by which Roman got Locust Point, was fully consummated before the claims against Mali had been established, and while Mali was acting under the belief, inspired by Roman's advice, that those claims were void. The arrangement only became illegal so far as Mali is concerned, by the use made of Roman's ownership, after the judgments had been recovered, and Roman's advice shown to be erroneous.

We seek to recover upon Mali's rights as a party to the original transaction, which was legal so far as he was concerned, and not on the basis of the fraudulent use subsequently made of that arrangement, to which we need not resort to support our claim. With reference to all the pretended claims against Mali brought forward by the respondent without proof, we say that having established

the relations of counsel and client between Roman and Mali, all benefits claimed by Roman from his client, must be shown to have been fairly and honestly obtained, and the presumption is against their validity.

This principle will dispose of the argument attempted to be made to show that Roman had acquired half of Locust Point. *If he had a deed for it,* it would be *prima facie* void. *Kerr on Injunctions,* 45 *and* 46, *top; Perry on Trusts,* secs. 202-3-5, *and* 846; *Howell vs. Ransom,* 11 *Paige,* 538; *Evans vs. Ellis,* 5 *Denio,* 640; *Todd vs. Grove,* 33 *Md.,* 143.

There was a resulting trust in favor of Mali, arising from the payment of the purchase money of the property in question. *Hill on Trustees,* 91, *margin; Lewin on Trusts,* 130; *Harrisburg Bank vs. Tyler,* 3 *W. & S.,* 373; *Unitarian Society vs. Woodbury,* 14 *Maine,* 281; *Harder vs. Harder,* 2 *Sanford Ch. R.,* 17; *Depeyster, et al. vs. Gould, et al ,* 2 *Green Ch.,* 474; 2 *Story's Eq. Ju.,* 1201; *Dryden vs. Hanway,* 31 *Md.,* 254; *Perry on Trusts,* sec. 133.

The proof of the existence of an account in Roman's books, in which Mali is charged with the purchase money of the property, against credits of money received by Roman for him, is a sufficient memorandum within the Statute of Frauds to establish the trust. *Cripps vs. Jee,* 4 *Bro. C. C.,* 472; *Prevost vs. Gratz,* 1 *Peters' C. C. R.,* 366; *McCubbin vs. Cromwell's Ex'or,* 7 *G. & J.,* 157; *Perry on Trusts,* 82, 133, *and cases cited.*

ALVEY, J., delivered the following opinion, which was concurred in by Judges BOWIE and BRENT:

A careful examination of the record in this case cannot fail for a moment to convince any one that, in the transfer and concealment of the property of Mali, in the name and apparent ownership of Roman, a gross fraud was perpetrated upon the creditors of the former. But, in the view of a majority of this Court, Mali was not less guilty in the

intent and practice of that fraud than Roman; they were clearly, according to our apprehension, *in pari delicto*. And as this suit is in effect an application to a Court of conscience, by one of the guilty parties, to have enforced the fraudulent and corrupt agreements, whereby he has succeeded in cheating and defrauding his creditors, we are decidedly of opinion that the Court should withhold its aid.

We are not unmindful of the fact, that there are exceptions to the general rule, that Courts of Justice will not actively interpose for the relief of a party who has been *particeps criminis* in an illegal or fraudulent transaction; and that one of the exceptions is, where the party suing, although *paticeps criminis*, is not *in pari delicto* with the adverse party. There may be different degrees of guilt as between the parties to the fraudulent or illegal transaction; and if one party act under circumstances of oppression, imposition, undue influence, or at great disadvantage with the other party concerned, so that it appears that his guilt is subordinate to that of the defendant, the Court, in such case, will relieve. But we have examined the record in this case in vain to find any evidence whatever of those circumstances that should entitle Mali to the benefit of the exception to the general rule. On the contrary, it is most fully and clearly shown that he was a man of intelligence, of large business habits and experience, and of considerable pretensions in the world, and by no means such a person as would be liable or likely to be inveigled, misled, or unduly influenced, by the fraudulent suggestions and advice of Roman. The whole transaction, from the beginning to the end, was the joint scheme of the two, the one co-operating with the other, and both being equally guilty, to withdraw and conceal Mali's property from the pursuit of his creditors; and having accomplished that object, and gotten rid of his creditors by a composition founded upon his fraud and deception, Mali now seeks to

have the property restored to him, through the instrumentality of a Court of Equity; and that too after the lapse of sixteen or seventeen years from the time of the original perpetration of the fraud, and after the death of his confederate in the transaction.

Whether the relation of client and attorney, in its full and proper sense, existed between Mali and Roman at the time of the concoction of the fraud, admits of great doubt, whatever may have been their relation afterwards. Mali has sworn that no such relation did exist, and that Roman held no property in which he, Mali, was interested; and we think he should be forever estopped to deny the truth of his sworn testimony upon the subject. But even conceding that the relation of client and attorney did exist, we think there is no well established rule of law that requires, under the facts disclosed in this case, that the Court should allow such effect to that relation as to form an exception to the general rule before stated. By so doing the attorneys would form a special class from which assignees would be sought in all cases where parties desired to cheat and defraud their creditors, by the assignment of their property. The general rule, by which all relief is withheld, might deter a party from conveying his property to an unprofessional person, but under the exception to that general rule, sought to be established in this case, if an unprincipled and fraudulent attorney could be found, the party could deal with him with impunity, being secure in the full protection of all the remedies administered by the Courts, for the restoration of the property after the fraudulent object had been accomplished.

The general rule to which we have referred is most salutary and conservative, as a means of suppressing illegal and fraudulent contracts, and nothing should be done by the Courts to weaken its force and operation. The suppression of such illegal and fraudulent transactions is far more likely, in general, to be accomplished by leaving the

parties without remedy against each other, and thus introducing a preventive check, than by enforcing them at the instance of one of the parties to the fraud ; and no where has this doctrine been more unqualifiedly adopted than in this State. *Stewart vs. Iglehart*, 7 *Gill & John.*, 132 ; *Freeman & Sedwick vs. Sedwick*, 6 *Gill*, 28. Public morals, public justice, and the well established principles of judicial tribunals, alike forbid the interposition of the Court to aid in the enforcement of a transaction like the present. The law leaves the parties to such transactions as it found them ; and if either has sustained loss by the bad faith of a *particeps criminis*, it is but a just infliction for premeditated and deeply practiced fraud, which, when detected, should deprive him of all anticipated benefit, or subject him to irrecoverable loss. *Bartle vs. Coleman*, 4 *Pet.*, 187.

Whether the confidential letter of Roman to his wife, exhibited in the record, contains such a declaration of trust in favor of Mali as may be enforced, we are not now called upon to decide, and in regard to which we intimate no opinion whatever ; but the present bill will be dismissed without prejudice to any right that the appellee may have in that behalf.

*Decree reversed, and*
*bill dismissed.*

(Decided 8th June, 1875.)

Stewart, J., filed the following concurring opinion :

From the proof adduced in the cause, there would be no difficulty in the establishment of the trust asserted in the bill, if the complicity of the complainant in the fraud to elude his creditors, did not incapacitate him according to the well settled rules of law, from maintaining his claims.

Resulting trusts are expressly excepted, by the 8th section of the Statute of Frauds from its operation.

Both upon reason and authority, there is no doubt, parol proof of facts and circumstances, may be adduced in a Court of Equity, to establish such trusts. *Dryden vs. Hanway,* 31 *Md.*, 254.

It is quite obvious, that there is abundant evidence in this case, to show that the property in question, was mainly, if not entirely purchased by means and moneys advanced to Roman by Mali.

It is equally manifest that these parties, Roman and Mali, were in fraudulent collusion to have the funds of the latter so invested in the property, as to evade the claims of his creditors.

Under such circumstances, that is, where two or more persons have been engaged in a fraudulent transaction to injure another, it is the established rule, that neither law nor equity will interfere to relieve either as against the other, from the consequences of their misconduct. *Freeman vs. Sedwick,* 6 *Gill,* 28.

This principle, in the administration of justice has its foundation in reasons of public policy.

The Courts have uniformly considered it the better and more effectual way to discourage fraud, not to interpose and adjudicate between the participants therein, except where their action may be necessary, to counteract the fraud.

The contract between such parties is enforced or avoided, as may best answer that purpose.

To allow the complainant to succeed through the Courts, in the recovery of the property in question, would not have the effect to counteract the fraud, but to render it successful. By permitting Roman to hold it, it is true, he derives a benefit from the fraud, but that is through Mali's agency, and the Court as between them, will not interfere for the reasons stated.

As to the effect of the fraud upon the interest of both delinquents in such cases, if the Courts had the power,

probably the better disposition to make of property thus perverted, would be to condemn it to public uses, after satisfying any just claims thereon; and thus deprive both of any right to hold it.

That Mali was very much under the guidance and direction of Roman, as the leading and master spirit in the fraudulent conspiracy, would seem to admit of no doubt; but that he was influenced by him to such extent, as to excuse and relieve him from the operation of the rule, is a proposition not to be defended, except at the sacrifice of the rule.

To relax the rule in cases where the relation of counsel and client existed, in favor of the latter, and make his case *per se,* an exception, would create a distinction without adequate reason. Whilst this has been done in some instances, in derogation of the general rule, its policy or justice may be well doubted. The uniform recognition of such exception might lead to pernicious results.

If the inequality of capacity between counsel and client, were such as to render the latter excusable upon general grounds applicable to all parties, there would be no reason to make the special exception.

There might be cases when the converse of the proposition would be true, where the counsel might be under the superior influence of his more sagacious client.

It is not always the case, that the counsel has more intelligence, or can exert more influence than the client.

Whilst an ignorant client, in the hands of more adroit counsel, might be entitled to some consideration; if it happened that the client in another case was the equal, or superior of his counsel, his exemption from the effect of the rule, would be simply preposterous.

Unable to apprehend the propriety of deviating from the general rule, where the relation of counsel and client exist, upon any principle of public policy or sound reason, I can discover no ground for distinguishing this case.

The position of counsel, as a minister of the law, may be a circumstance to be considered with other facts, in deciding in any case, upon appropriate grounds, whether the rule ought to be applied.

Both parties here, according to the evidence are properly *in delicto.*

Where they are *in pari delicto,* the rule *"potior est conditio defendentis,"* strictly applies.

If they are *participes criminis,* although in different degrees, the rule on that account is not to be evaded ; for no man can be permitted to set up his own iniquity, or its result, although less criminal than his confederate, as a ground of action, any more than his confederate, can plead his, as a defence.

Where both parties are involved in the fraud, although the one, to some extent, under the influence of the other, and therefore, it may be, less guilty in the forum of absolute justice ; it is not the province of the Court, nor within their power, to exactly graduate their relative demerit or *delictum ;* and because one is not quite so bad as the other, to relieve him of his disability under the rule.

That would impair the practical virtue of the rule, by metaphysical refinements, and the Court could reach no satisfactory conclusion.

The duty of adjudicating between the comparative faults of contestants, is not imposed upon the Court ; and it is not their province to determine mere moral questions.

Men are so differently constituted in their endowments and capacities, that there could hardly be a case where two or more parties were concerned in a fraud, but that one would be in some degree under the influence of another.

To measure their precise relative criminality by the moral standard, where there are slight shades of difference, would be a difficult and speculative undertaking, not necessary to the attainment of practical justice. Where the disparity between confederates in fraud, virtually

amounts to the irresponsibility of the one, the reason of the rule would cease to operate, and he should not be denied the right to maintain his action against the other. But, if both, are substantially, or without reasonable extenuation *in delicto,* they must be treated as *in pari delicto,* where there are no other sufficient reasons, entitling the one to be relieved from the application of the rule. The Court is not called upon to decide which was the worse man of the two, or which proved false to the other. See 2 *Parsons on Contracts,* 782.

Were they both grossly in fault, and is there any thing fairly entitling the one to sue the other, notwithstanding the rule applicable to confederates in crime, are the questions involved.

Applying that rule so firmly established, to the confederates in this fraud, considering all their relations and capacities, there would seem to be no other alternative, according to the facts in this case, but to leave the parties, where by their conduct they have placed themselves in relation to the property in question.

For the purpose of eluding his creditors, Mali having entrusted his funds to the keeping of Roman, and confided the management of the enterprise to him ; if he has been deceived by his accomplice ; upon what principle can he expect the Courts to come to his aid and rescue him, in the absence of proof that such was the influence exerted over him professionally, or otherwise by Roman, that he had not the power to resist it?

This has not been attempted, but the evidence exhibits him, the surviving victim of his own fraudulent complicity, asking to be relieved.

It is beyond the power of the Court governed by its established rules, to give him the relief sought by the bill. The decree of the Circuit Court must be reversed and the bill dismissed, without prejudice to any right he may be able to establish under the confidential letter of Roman to the respondent.

ROBINSON, J., filed the following dissenting opinion, in which Chief Judge BARTOL and Judge MILLER, concurred :

The bill in this case was filed against the appellant as devisee of the late J. Philip Roman, to compel her to convey to the appellee certain property on Locust Point, in the City of Baltimore, the legal title to which was held by Roman at the time of his death.

It substantially alleges that Roman acquired the title to the property in the capacity of agent and legal adviser of Mali, the complainant, that he paid for it with the money of Mali, and that from the time of its purchase until his death, in 1871, he held it as agent and trustee of Mali.

The appellant, in her answer, denies all the material allegations in the bill touching the purchase of the property by Roman, as agent or legal adviser of Mali, relies upon the lapse of time and the entire absence of any written evidence of the title of Mali to this valuable property, and says if it should be established that Roman acquired the title to the property in pursuance of an agreement between him and Mali, for the purpose of concealing it from the creditors of Mali, the latter has no right to invoke the aid of a Court of Equity to restore to him the property thus fraudulently conveyed.

The law in regard to presumptive or resulting trusts, as applicable to the case before us, is too well settled to admit of much contention. It is sufficient to say, that in all cases where the conveyance of the legal estate is taken in the name of one person, while the consideration money is paid or furnished by another, the parties being strangers to each other, a resulting or presumptive trust arises by virtue of the transaction, and the person named in the conveyance will be held to be a trustee for the party from whom the consideration proceeds. And inasmuch as the Statute of Frauds extends to creations or declarations of trusts by parties only, and does not affect, indeed expressly excepts, trusts arising by operation or constructions of law,

it is competent for the real purchaser to prove his payment by parol evidence, even though it be otherwise expressed in the deed.

In some of the earlier cases, it is true, a distinction was taken in regard to the nature and character of the proof, *before* and *after* the death of the *nominal purchaser*, and it was held in some of these cases, that after the death of the nominal purchaser, *parol evidence* alone was not sufficient to establish a trust against the express declarations in the deed. These cases, however, have been overruled, and it may now be considered settled law, that whatever effect the death of the nominal purchaser may have upon the weight of the testimony, it does not affect its admissibility.

In *Leach vs. Leach*, 10 *Vesey*, 517, where the plaintiff after the death of her husband endeavored to establish a claim to a trust in an estate, on the ground that it had been purchased by her husband with trust money, Sir WILLIAM GRANT held, "that the question as to whether the purchase was made with trust money, depended upon the proof of the fact, and whatever doubts may have been formerly entertained on the subject, it was now settled, that money may be followed into the land in which it was invested; and that a claim of this kind may be established by parol evidence. It may be proper to say however, that the proof in such cases ought to be of the most certain and satisfactory character."

The first question then, to be determined, is whether the proof in this case, conclusively shows, that the property in question, was purchased by Roman for and on account of Mali, and paid for with Mali's money?

It would extend this opinion to an unreasonable length, to examine in detail the testimony to be found in the five hundred pages of this record, and we shall therefore refer only to some of the prominent facts bearing upon this question.

In 1853, the Messrs. Ellicotts sold the Locust Point property now in dispute, to Otis P. Jewett for the sum of

$85,000. Jewett paid $15,000 cash, assumed to pay certain liens and incumbrances upon the property amounting to $37,071.02, and gave his several notes for $32,928.98, residue of the purchase money, the payment of which was secured by a mortgage of the property.

In April, 1853, Mali, the complainant, purchased of Jewett a half interest in the property, in consideration of which he paid $7500, being one-half of the cash payment paid by Jewett, and agreed to pay one-half the purchase money due to the Ellicotts.

In the spring of 1854, Mali being about to leave for Europe, seems to have requested Roman to send him a power of attorney, authorizing Roman to act for him in reference to his interest in this Locust Point property, during his absence. Roman enclosed the power of attorney to be executed by Mali, and says:

"It is very broad, and therefore, I wish you to write me, giving particular instructions with regard to the property, if sold, as to price, &c. Be assured, I will look entirely to your interest, yet I hope Mr. Jewett will buy you out. If he finds you intend to divide, I think he will at once come into terms."

On the 3rd of June, the day on which Mali sailed, Roman told Jewett that Mali had placed all his business affairs in his. (Roman's) hands, as his (Mali's) counsel and trustee.

While Mali was in Europe, the Parker Vein Coal Company, of which he had been President, failed, in consequence of which he returned home much sooner than he expected. On his return, he found himself threatened with suits by certain stockholders of the Company to recover damages on account of the over-issue of stock.

At that time Mali lived in the city of New York, and was worth from one to two hundred thousand dollars. Roman lived in Allegany County, in this State, and was a director in and attorney for the Parker Vein Coal Com-

pany, which owned large and valuable coal mines in that county. Mali, evidently alarmed on account of these suits, writes to Roman, his attorney, and in reply the latter says :

"Converse with no one before you take legal advice." "Don't be frightened, they can't hurt a hair of your head, and as to confiscation, that is all humbug I regret exceedingly you did not tell me of the difficulty when you were in Cumberland. I think if you had done so, my advice and counsel would have relieved you of all difficulty ; don't be alarmed, take legal advice and be careful about your declarations. Let me know when you return ; telegraph at once."

This letter was dated July 11th, and on the 24th of the same month, we find Roman in New York making preliminary arrangements, by which the Locust Point property ultimately came into his possession. Nothing was done in reference to this property during Mali's absence in Europe, although it is evident from the correspondence and power of attorney referred to, that he expected to make a sale of it through Roman, as his agent. On the 25th of July, the day after Roman arrived at New York, Mali sells his one-half interest in the property to Jewett, for $50,000, and sells also to him certain stock in the Parker Vein Steamship Company, for $25,000. To secure the payment of these several sums, amounting to $75,000, Jewett mortgaged the whole property to Mali. In making this sale, the proof shows that Roman acted as Mali's attorney and agent. The $75,000 note and mortgage were at the same time assigned by Mali to Roman. In the latter part of 1854, suits were brought against Mali, and also against Jewett to recover damages from them on account of the over-issue of the Parker Vein Coal Company's stock. Roman was the counsel both of Mali and Jewett, and advised them that these claims were unfounded, and that the suits were only intended to levy black-mail.

In consequence of these suits, and for the purpose of placing it beyond the reach of judgments, should any be recovered, Jewett conveyed his interest in Locust Point, the same being a mere equity of redemption, to his brother Clarence Jewett.

On the 1st of January, 1855, the notes and mortgage to the Ellicotts for the unpaid purchase money became due, and the Jewetts having failed to pay the same, an *ex parte* petition was filed on the 15th of the month by Roman, as assignee of said notes and mortgage, for a sale of the property. Upon this petition a decree was passed and George H. Williams, Esqr., appointed trustee. No sale, however, was made under this decree.

The next step by Roman was to get from Clarence Jewett a conveyance of the interest held by him under the deed from his brother, Otis. For this purpose, Roman had several interviews with Clarence, in which he represented himself as acting as the agent of Mali, and with a view of protecting Mali's interest in the property. He told Clarence Jewett that the deed from his brother Otis was made without consideration, and would not stand the test of the law, and that it would not be safe for Mali, under the circumstances, to advance any more money on account of the property. He then proposed that Clarence should convey to him whatever interest he Clarence might have under the deed from his brother Otis, the same to be held by Roman for Mali's benefit. To this Clarence finally assented, with the understanding that the interests of his brother and himself should be protected. When the deeds were prepared, the name of J. Dixon Roman was inserted as grantee, J. Philip Roman saying, it was necessary that the conveyance should be made to a third party. These deeds were executed on the 7th of February, 1855, and on the 10th, Roman filed an original bill to foreclose, in which he refers to the former proceedings, and prays that the decree under them may be annulled for the following reasons.

1st. That since he purchased the Ellicott mortgage, he had discovered that part of the property is leasehold and that one-quarter's rent is due.

2nd. That Mali held a mortgage from Jewett upon the property for $75,000, the condition of which was broken by Jewett's failure to pay the Ellicott mortgage, and that Mali insists he has a right to proceed without delay under his mortgage.

3rd. That Otis P. Jewett had assigned his interest to Clarence, and that the latter had assigned the same to J. Dixon Roman. The bill then avers that by reason of Jewett's mortgage to Mali, and the conveyance to J. Dixon Roman, the title to the property may be clouded, &c.

The bill of February 10th being filed, answers, admitting the averments of the bill and consenting to a decree as prayed, were filed at the same time by Jewett and wife, Mali and J. Dixon Roman ; and on the same day a decree for sale was passed, and Mr. Williams was again appointed trustee. On the 15th of March, 1855, the property was sold by the trustee for $46,000, subject to the same liens which were on it when Jewett purchased, in 1853, and J. Philip and J. Dixon Roman were returned as purchasers. On the day of the sale J. Philip Roman writes to Mali:

"I bought the property to-day, in the name of J. Dixon Roman and J. Philip Roman, for $46,000 cash, subject to mortgages. No bid but mine."

After years of protracted litigation, judgments were finally recovered against Mali in the suits for damages on account of the over-issue of the Parker Vein Coal Company's stock, amounting in the aggregate to over one hundred and fifty thousand dollars. At the instance of the judgment creditors, Mali was examined under oath, for the purpose of making him disclose what property he had, and what disposition, if any, he had made of the same. In this examination Mali denied that Roman was his counsel, and also denied having any interest in the property now in dis-

pute. Subsequently a bill was filed by a receiver against Mali and Roman, in which it was alleged, among other things, that Mali had transferred to Roman large claims held by him against the Parker Vein Coal Company, and also large interests in real estate in Maryland, for the purpose of defrauding his creditors. To this bill, separate answers were filed by Mali and Roman under oath, in which the allegations of the bill were emphatically denied by them in every particular. Thus baffled in every effort to reap the fruits of their judgments, the creditors were finally induced to accept Roman's offer of eleven cents in the dollar, and upon the payment of this sum the judgments were entered to the use of Roman.

We have thus endeavored to trace, as briefly as possible, how and by what manner Mali acquired an interest in the property—the disposition he made of the same, the relations of Roman with him, and the connection of the latter with the Locust Point property. In doing this we have seen that Mali, who prior to the institution of these suits, was a member of a large and prosperous mercantile firm in the city of New York, and worth from one to two hundred thousand dollars, stripping himself of all his property, assigning at one time to Roman a mortgage of $75,000, and then at another, bonds of the value of thirty thousand dollars, until not a dollar's worth of property could be found within the reach of the judgment creditors. On the other hand, Roman, who prior to this time was without any property, borrowing small sums of money to meet his daily necessities, suddenly becomes a man of fortune, with thousands of dollars at his command, buying property at a cash sale for $46,000, and, as the record shows, immediately thereafter expending as much more in its improvement. The inquiry then naturally suggests itself, are we dealing with truth or with fiction?—were the assignments by Mali to Roman made for a valuable consideration?— were the Romans, in fact, the purchasers of the Locust

Point property?—did the answers filed by Mali and Roman under oath in the proceedings by the judgment creditors, speak the truth?—or were they one and all but false and fraudulent devices, successive steps of a scheme deliberately and corruptly planned by Roman, and through fraud and perjury successfully carried out, the purpose of which was to get possession of Mali's property, and thereby defraud Mali's creditors?

The facts already referred to are sufficient at least, we think, to excite a suspicion in regard to the good faith of these transactions, but when viewed in connection with the proof we are now about to consider, there can be no difficulty in answering each and all of the inquiries above suggested.

The Locust Point purchase amounted to $46,000, of which $16,574.42, was audited to the $75,000 note of Jewett to Mali, thus leaving but $29,425.58, to be paid to the trustee. Now if we turn to pages 20, 21, of Ledger J. P. Roman, we find the following entries under the head of "Locust Point estate:"

| | | |
|---|---|---|
| 1855. D. To cash paid through Geo. H. Williams, trustee, under auditor's report.. | $29,518 | 58 |
| B. Five houses built by Clarke and Smith; see account B, filed with my papers... | 2,377 | 65 |
| A. Cost of repairs to warehouse, new roof, stone foundation, &c...................... | 2,795 | 64 |
| C. Cost of coal wharf; see account C.,...... | 20,402 | 48 |
| E. Amount paid through A. C. Hall; see account A................................ | 1,263 | 22 |
| F. Cash paid out by J. Philip Roman in 1855; see account F and vouchers..... | 3,086 | 59 |
| 1856. G. Amount paid out per account G filed with my papers.......... .......... | 10,931 | 20 |
| 1857. H. Cash paid out per account, and vouchers filed with my papers, marked H | 20,853 | 45 |
| 1858. J. Paid out per account, and vouchers filed, marked J............................. | 3,214 | 96 |
| Thus making the sum of...................... | $94,443 | 77 |

paid by J. Philip Roman during these years on account of the property. Now if we turn to page 28 of the same Ledger under the head "Hippolyte Mali," we find the following debits charged against Mali:

"1855-56-57-58, Cash at divers times, see accounts, $89,754.59.   { $94,443.77."

It thus appears that every dollar paid by Roman on account of the property, and every dollar paid for its improvement amounting in the aggregate to $94,443$\frac{77}{100}$, was charged by him to Mali. These entries by Roman, in his own Ledger, prove beyond all controversy, that the property in question was purchased by him, and improved as the agent of Mali. They are susceptible of no other construction. And as to the further question, whether he had at the time money in hand belonging to Mali, sufficient to pay the purchase money, is we think answered by other entries to be found in the same Ledger. The whole amount of purchase money, applicable to every charge against the property, except the $75,000 note and mortgage of Mali, was $29,425$\frac{58}{100}$, from which must be deducted James' lien of $4,662$\frac{18}{100}$, paid by Mali before the sale, thus leaving but $24,763$\frac{40}{100}$ to be paid to the trustee. Now on page 27 of the Ledger, Mali is credited with $49,373$\frac{17}{100}$, to which must be added the further sum of $12,600, the proceeds arising from the sale of 35 steamship bonds, making $61,973$\frac{17}{100}$. Deduct from this sum, the debits charged against him on the same page, amounting to $35,577$\frac{75}{100}$, and we have due to Mali in April, 1855, $26,395$\frac{42}{100}$.

If the case rested here, it must be admitted there is strong and pregnant proof, tending to show, not only that the property was purchased for Mali, but also that it was paid for with his money. But if to this proof we add the testimony of Spates, Otis P. and Clarence Jewett, the conclusion is irresistible. Of all persons, Spates certainly had the best opportunity of knowing the facts and circumstances connected with the purchase of the property. He

was Roman's trusted and confidential friend, with whom he consulted, not only in regard to the purchase and improvements, but in fact as to every step taken in connection with the property. Spates testifies, that Roman told him before the sale, that he intended to buy the property, put up buildings, improve it and make it a coal depot for Mali; that by the first of April, 1855, he would have in hand at least sixty thousand dollars belonging to Mali; that in 1856, he would receive thirty thousand dollars more, and that the entries in his books would show these credits to Mali. After the purchase, he went with Roman, examined the property, selected the location for the coal wharf, and estimated the cost of the same. That Roman was to submit the plans to Mali, and if approved by him, he Spates was to superintend the erection of the same. He further testifies that Roman told him, that the entire control and management of the property was to remain in his, Roman's hands, until the New York suits against Mali were settled, and then the property was to be returned to Mali. That between the years 1855 and 1862, witness was present at repeated interviews between Roman and Mali, when the receipts from and expenditures on the property were discussed, and vouchers exhibited and examined; that it was understood between them, that the account was to be kept in Roman's Ledger, under the head of "Locust Point," and that in their correspondence, no reference was to be made of Mali's ownership of the property.

Otis P. Jewett testifies that prior to the sale of the property, Roman told witness that he wanted to secure the title of the property for Mali, and that after the sale, so late as the year 1867, in repeated conversations with Roman about the property, he always said he held it for Mali, and spoke of it as Mali's property, and never intimated that either J. Dixon Roman or himself had any interest in it.

In addition to this, Clarence Jewett says, that in all his interviews with Roman in regard to the conveyance of the interest held by him under deed from his brother Otis, Roman professed to be acting as the agent of Mali, and said his object was to protect Mali's interest.

It is unnecessary to extend this opinion by a review of other facts to be found in the record. It is sufficient to say, that upon the proof already referred to, upon the written admissions of Roman himself—upon the positive testimony of Spates and the two Jewetts, witnesses unim peached and uncontradicted, we are forced to the conclusion that the property was purchased by Roman as the agent and legal adviser of Mali, and paid for with Mali's money.

In regard to J. Dixon Roman, it is only necessary to say, that the whole record shows that he never in fact had any interest in the property, and that he was returned as one of the purchasers, and his name inserted in the deed from Clarence Jewett, for the purpose of deceiving and misleading Mali's creditors.

We come now to the question, conceding that the legal title of the property was conveyed to Roman in pursuance of an agreement with Mali for the purpose of defrauding Mali's creditors, will a Court of Equity compel the appellant as devisee of Roman to re-convey the property thus fraudulently acquired? As between man and man standing upon an equal footing, we should not hesitate to say no. In such a case the maxim "*in pari delicto*" would apply in its fullest force. But this maxim, wise and salutary as it may be, is not one of universal application, on the contrary, it is subject to certain exceptions as binding in authority as the rule itself. We take the law to be well settled, that although both parties are *in delicto* it does not always follow that they stand *in pari delicto;* for there may be, and often are, very different degrees in their guilt. " One party may act under circumstances of oppres-

sion, imposition, hardship, undue influence, or great in-
equality of condition or age; so that his guilt may be far
less in degree than that of his associate in the offence, and
in such cases public policy may require that relief should
be granted, however reprehensible the acts and conduct of
the parties may be." 1 *Story's Equity Jurisp.*, sec. 300;
*Osborne vs. Williams*, 18 *Vesey*, 379; *Lord St. John vs.
Lady St. John*, 11 *Vesey*, 535; *Smith vs. Bromley, Doug.*,
696; *Browning vs. Morris, Cowper*, 790; *Morris vs. Mc-
Cullock*, 2 *Eden*, 191; 1 *Fonblanque's Equity, book* 1, *chap.
4, sec. 4, note y.*

The question then resolves itself into this, does the testi-
mony in the record before us, prove such an inequality of
condition between Roman and Mali, and the exercise of
such an influence by the former over the latter, as to
entitle the complainant to relief, although he may have
been a party to the fraud relied on by the appellant? Now
if there is one fact established beyond all controversy, it is
*that before and at the time of the sale of the property* in
question, the relation of client and attorney existed be-
tween them. Further than this, the proof conclusively
shows, that in the long and protracted litigation growing
out of the suits against Mali to recover damages on account
of the over-issue of the Parker Vein Coal Company's stock,
in the sale by Mali to Jewett of his interest in the Locust
Point property—in the cunningly devised chancery proceed-
ings under which the property was sold, in the examina-
tion of Mali under oath, and in the subsequent proceed-
ings by Hicks the receiver, Roman was *the master-spirit
who planned, advised and counselled every step by which he
thus acquired possession of Mali's property, and prevented
the judgment creditors from reaping the fruits of their judg-
ments.*

Before Mali sailed for Europe and before the failure of
the Parker Vein Coal Company, Roman encloses to him a
power of attorney in the broadest terms, authorizing him

to act as attorney. After the failure of the company, and when Mali was threatened with suits on account of an over-issue of stock, he writes:

" Don't be frightened, they can't hurt a hair of your head."

Afterwards when Mali seeks his counsel and advice he tells him *" to put all his property and the cases in his hands, follow his advice and he would see him through."* Other counsel it is true were employed in the New York cases, but they acted under the guidance and control of Roman.

To his confidential friend Spates he writes:

" Proceed very slowly with your negotiations, I do hate to give them any money, or to allow them to get any advantage of us, it will not do to give judgments now. Feel your way carefully."

On the 18th of February, he writes again :

" I will go to the library here to-morrow and examine all the New York decisions. I hope you will get Vander-pool's opinion, and if he suggests it, better get a written opinion from one of the tiptop lawyers."

Then again February 20th :

" You had better break off negotiations for awhile."

And on March 3rd :

" I think we will have to execute powers of attorney to confess judgment for about $25,000. If you talk with them, tell them we are afraid of other suits, and propose that, as it will secure all their influence against additional suits. Talk largely about O'Connor's opinion that he can gain the suit."

The relation of client and attorney is one of truth and confidence, and in regard to transactions between parties occupying this relation, Courts subject them to other and stricter tests than apply to the dealings between man and man standing upon an equal footing.

In *Ford vs. Harrington*, 16 *N. Y.*, 285, where an attorney advised his client to convey to him an interest in pro-

perty, for a grossly inadequate consideration, for the pur-
pose of defrauding the creditors of the client, promising
at the same time to reconvey the property to the client,
after an arrangment should have been made with the
creditors, Bowen, J., said:

"I think this is a case where, on account of the relations
existing between the parties and the circumstances under
which the contract was assigned, the Court was called upon
to interfere and compel the attorney to restore what he had
acquired under the assignment, on being repaid what he
had disbursed, although the object of the assignment was
to perpetrate a fraud. The parties, although in '*delicto*,'
did not stand '*in pari delicto*.' In the transaction, Con-
way was the mere instrument in the hands of the defen-
dant. If an attorney will so far forget, or wilfully disre-
gard his duty to the Courts, whose license to practice he
holds, to his clients, who, in consequence of such license,
are induced to seek and act upon his counsel, and to the
public, as, for the purpose of gain or profit to himself, to
induce by his advice the commission of fraud by those who
thus confide in him, he at least should be compelled to
restore to his victim the fruits of his iniquity."

The subsequent cases of *Freelove vs. Cole*, 41 *Barbour*,
318, and *Goodenough vs. Spencer*, 2 *N. Y. Sup. Court
Rept.*, 588, approve and sanction the doctrine thus laid
down in *Ford vs. Harrington*.

It is not necessary in this case to rest the right of the
complainant to relief solely upon the relation of client and
attorney. There is proof to show that owing to his
troubles, the mind of Mali had in a measure become
impaired, and it is impossible to read this record without
seeing that from the time he first sought the counsel of
Roman, the latter exercised the most unbounded influence
over him.

To permit a lawyer who thus advises his client, harassed
by suits for damages, that the claims are unfounded, and

the suits instituted solely for the purpose of levying blackmail, who subsequently corruptly counsels him to put all his property in his hands, with the promise to see him safely through, and who in the language of the learned Judge below, leads his client " along the slippery paths of fraud and perjury," to interpose the plea of *pari delicto*, is, with due respect to the opinion of the majority of the Court, a strange perversion of the principles of public policy, upon which that wise and salutary maxim is founded.

The appellee's counsel on the 11th October, 1875, made a motion for a re-argument of the foregoing case, assigning the following reasons in support thereof:

The question presented for decision was not whether the Court would give its aid to either of two parties who stand in *pari delicto*, it having been conceded in the former argument, that in such a case the Court will leave the parties as it finds them. But the real question to be determined is whether, when both parties are *in delicto*, one of them being however, in the eye of the law, more guilty than his adversary, the Court will not upon grounds of public policy, give relief to the less guilty.

In deciding upon the question of the relative degrees of guilt between parties to an illegal transaction, for the purpose of applying this principle of law, it is submitted that the Court does not consider the *actual relative capacity* of the parties, in order to determine which is the more in fault.

Relief in such cases is not granted because one party has availed himself of his personal superiority to oppress or defraud the other. When that state of facts is made to appear, the party oppressed or defrauded, is entitled to relief *in his own right*, growing out of his situation.

But relief is granted on grounds of public policy, and is granted for the advantage of the public, and not of the

party to whom it is given. The question of public policy in its application to such a case, arises from the *relation* in which the parties to the unlawful transaction stand towards each other, and not from their relative personal capacity to oppress or defraud.

The public is concerned in the maintenance of certain relations between parties in the strictest purity and integrity; irrespective of all considerations of their relative personal power and capacity. When those relations are shown to exist, the law concludes one party to occupy a position of superiority to the other, which cannot be used to gain an advantage for him who is thus presumed to be the superior.

Among the relations which public policy requires to be thus guarded, is that of counsel or legal adviser, and client, and when it appears that a lawyer has advised his client to do an unlawful act, by which the former has obtained possession of the property of the latter, the law presumes from *the relation* itself, without evidence as to which was *in fact* the more *capax doli*, and without weighing their actual personal capacity, that the parties do not stand in *pari delicto*, but that the lawyer is the more guilty of the two.

This conclusion is drawn not in the interest of either party, but in the interest of the public, which requires the maintenance of the utmost integrity and good faith on the part of the legal adviser. In the language of Judge STORY, "There may be on the part of the Court itself, a necessity of supporting the public interests, or public policy, in many cases, however reprehensible the acts of the parties may be." (1 *Eq. Jur., sec.* 300.)

This principle is recognized by three of the Judges who concur in reversing the decree below. They say: "There may be different degrees of guilt as between the parties to the fraudulent or illegal transaction, and if one party act under circumstances of oppression, imposition, undue influ-

ence, or at great disadvantage with the other party concerned, so that it appears that his guilt is subordinate to that of the defendant, the Court in such case will relieve.''

The minority of the Court agree in this principle, and it is not questioned, except by one of the seven Judges who heard the case. But in applying the principle, the three Judges who united in the reversal are understood as deciding that, in order to ascertain the existence of that disparity in guilt on which relief will be granted to one of two guilty parties, we are to weigh their relative personal degrees of capacity, instead of inferring it from the relation in which they stand.

In other words, it is understood to be laid down, that if counsel and client engage in an illegal transaction, under the advice and direction of the former, the Court will enquire which of the two was actually the more capable of imposing upon the other, and to what extent the client was personally capable of resisting and preventing the fraud of his counsel, and if it appear that the client was the more capable, mentally or morally, or both, than his legal adviser, relief will be refused to the former against the latter.

It is submitted, that is not in accordance with the meaning or policy of the rule as stated by the majority of the Court. It would result from such a principle of decision, that a lawyer may retain whatever he can get by advising a client of equal or superior capacity to his own, but that he will be made to restore what he gets by the same means from a client of less capacity.

The principle of the rule of public policy as applied to the relation of counsel and client, would thus be made to depend, not upon the absolute inviolability of the fidelity and integrity of the relation of counsel, but upon the extent of the personal capacity of the client. Public policy has nothing to do with the degree of personal capacity that clients may possess. It is as much against

public policy for a lawyer to defraud an experienced and sagacious client, as a weak and inexperienced one. Public policy demands that the protection of the client in all cases shall be found in the law which governs the relation itself, and that protection cannot be afforded, if the Court permit the actual degree of personal capacity to be enquired into. The principle for which we contend, and the application of it in the manner we suggest, is well settled by authority. *Lester vs. Howard Bank,* 33 *Md.,* 562 ; 1 *Story's Eq. Jur., sec.* 308 ; *Scott vs. Leary,* 34 *Md.,* 390.

In the latter case, relief was given to a party to an illegal transaction, because his infirmity in guilt was conclusively presumed from the establishment of the *relation* between the parties (that of debtor and creditor,) and there was no inquiry into the question of their actual relative degrees of capacity to enable the Court to decide which was *in fact* the more guilty.

In *Austin's Adm'r vs. Winston,* 1 *Henning & Munford,* 32, the Court of Appeals of Virginia, gave relief to one of two parties to just such a transaction as this between Roman and Mali, upon the sole ground that it had been advised by *a creditor,* and that from the *relation* alone, the law presumed him to be more guilty than his debtor, who followed his advice. The Court say : " It is said that Winston was probably indebted ; that his conduct was a great violation of morality, in respect to his creditors ; and that in point of morality, he was most culpable. That Winston violated the principles of morality, is already implied, in the admission that he had committed a fraud ; but that fraud is palliated and excused by reason of the imbecility of his situation. But how does the case stand with respect to Austin ? * * * * To say the *least,* he hatched and brought to maturity a *free* and voluntary fraud to the injury of Winston's creditors ; to say the truth, he capped the climax of his iniquity, by committing a double fraud towards his companion. So little regardful was he of the

rules of morality, that he has not even observed a maxim sacred among thieves and felons, 'to be just and honest towards one another.' " p. 44.

The rule we contend for was applied in this instance because the parties to the fraud stood in the relation of debtor and creditor. In *Osborne vs. Williams*, 18 *Vesey*, 379, Sir WILLIAM GRANT, applied the rule to a case in which the parties stood in the relation of father and son, both having been concerned in a fraud upon the Post Office Laws.

See also *Reynell vs. Sprye*, 1 *DeG. Man. & G.*, 535. In *Ford vs. Harrington*, 16 *N. Y.*, 285, and in two decisions in the Supreme Court of New York, (41 *Barbour*, 318, *and* 2 *N. Y. Sup. Ct. Reps.*, 508 *and* 511,) the rule for which we contend, was applied to the relation of counsel and client.

We submit that no authority can be found to sanction the contrary doctrine.

We also refer the Court to the numerous decisions of tribunals of the highest resort at home and in England, cited in our original brief on the same question. Without discussing further than has already been done at the trial, the abundant evidence to be found in the record, that Roman concocted and executed the fraud in this case, and that Mali was a passive instrument in his hands, we submit that the Court should allow a further argument upon the interesting and important subject above discussed, with a view to consider whether the opinion of the majority can be reconciled with the current of English and American decisions.

ALVEY, J., delivered the opinion of the Court.

In disposing of applications for re-argument, after the case has been acted on by the Court and the judgment has been entered, this Court has adopted the rule which obtains in the Supreme Court of the United States, as announced

by the late Chief Justice TANEY, in the case of *Brown vs. Aspden*, 14 *How.*, 25; *Kent vs. Waters*, 18 *Md.*, 53, 73; *Johns vs. Johns*, 20 *Md.*, 58. That rule is, that no re-argument will be granted unless some member of the Court, who concurred in the judgment, doubts the correctness of his opinion, and desires a further argument on the subject, and not then unless the proposition receives the support of a majority of the Judges who heard the case; (*Ambler vs. Whipple, October Term Sup. Court*, 1874, *not yet reported;*) and when that happens, the Court will, of its own accord, apprise the counsel of its wishes, and if it does not desire to hear further argument on the whole case, will designate the points on which it desires to hear them.

In this case, very full and able arguments were heard at the bar, and elaborate briefs were filed by both sides; and it was not until after the most careful consideration and repeated conferences upon the subject, that the conclusions were announced at which the Court arrived, though concurred in but by a bare majority of the Judges who heard the case. This division of the Judges, upon a question of so much importance, was certainly unfortunate, and very much to be regretted; but no Judge who concurred in the judgment rendered is dissatisfied with his opinion, and therefore further argument is not desired; and, indeed, if further argument than that heard at the bar were desired, we have it, on the part of the appellee, in the elaborate printed argument in support of the motion for re-hearing. This latter argument has been carefully examined and considered, but the Judges who concurred in the judgment that has been rendered, fail to find in that argument anything that causes them to doubt of the correctness of their previous conclusions.

In order, however, to avoid all possible misapprehension upon the subject, we deem it proper to state, that the general rule governing transactions between client and attorney is in no manner designed to be questioned, or in

the slightest manner qualified or impaired by the decision of this case. Over such transactions Courts of Equity exercise the most exact scrutiny, and are always disposed to view them with more than ordinary jealousy. But in this case, the simple fact that Roman was an attorney can make no difference in considering the transactions between himself and Mali ; and even if it be conceded that the relation of client and attorney existed between them, the rule does not go the length of absolutely avoiding transactions between parties standing in that relation. The attorney is under no actual incapacity to deal with or purchase from his client. All that can be required is, that there has been no abuse of the confidence reposed ; no imposition or undue influence practiced, nor any unconscionable advantage taken by the attorney of the client. When a transaction between parties occupying such relation to each other is brought in question, the onus of the case is cast upon the attorney of showing that nothing has happened in the course of the dealing which might not have happened had no such connection subsisted, and that the transaction has been fair in all respects. If the Court be satisfied that the party holding the relation of client performed the act or entered into the transaction voluntarily, deliberately and advisedly, knowing its nature and effect, and that no concealment or undue means were used to obtain his consent to what was done, the transaction will be maintained. Such is the rule as deduced from the best considered cases upon the subject, and which is said to be dictated from motives of public policy. *Gibson vs. Jeyes,* 6 *Ves.,* 266 ; *Montesquieu vs. Sandys,* 18 *Ves.,* 302 ; *Hunter vs. Atkins,* 3 *M. & K.,* 113 ; *Edwards vs. Meyrick,* 2 *Hare,* 60 ; *Savery vs. King,* 5 *H. L. Cas.,* 627, 655 ; *Sugd. on Ven. & Pur.,* (7 *Amer Ed.,*) 895.

But this wise and salutary rule, instituted to promote honesty and fair dealing, and which the Courts are always ready to uphold and enforce upon all proper occasions, was

never designed to relieve a party in the position of the appellee in this case. It never contemplated relief to a dishonest client who has combined and confederated with his attorney to cheat and defraud his creditors. If the appellee occupied the position of a client whose confidence had been abused and taken advantage of in a transaction with his attorney, and the circumstances of his case were such as not to require him to allege and establish his own fraud, in order to reach and expose that of the attorney, the rule that has been stated would apply in its full force, and the Court would not hesitate in granting relief.

But what is this case? In brief it is this. In a particular crisis in Mali's affairs, he desired to conceal and shield from the pursuit of his creditors his property, and to accomplish that object he combined with Roman, who was active in devising the fraudulent scheme whereby the property was effectually concealed and the creditors defrauded. The property was concealed under Roman's ostensible and acknowledged ownership; and that ownership was held out and maintained by both Mali and Roman under all circumstances against Mali's creditors, even to the extent of swearing, in the most positive and unequivocal manner, in a judicial proceeding, that Mali had no interest in the property whatever. Upon what terms or understanding this fraudulent combination between Mali and Roman was entered into, the record does not disclose; but the scheme was most adroitly executed and maintained by the parties for nearly seventeen years, and until all the creditors designed to be cheated had been induced to surrender their claims, upon the supposition that Mali had no property, on payment of some nine or ten cents in the dollar. During all this long period, Mali not only acquiesced in, but maintained, against the most searching efforts of his creditors, Roman's pretended ownership; and notwithstanding the many opportunities, and the strong honest incentives that should have induced him to withdraw

from the combination and expose the fraud, there is no suggestion that he had been misled, unduly influenced, or imposed on, until after Roman's death, when it was no longer feasible to maintain and carry on the fraudulent scheme that had been so effectually devised.

But it is said that Roman was Mali's legal adviser, and that he devised and concocted the fraudulent scheme, and counselled Mali's course in reference to it; and that, therefore, notwithstanding Mali's fraudulent conduct, he ought to have the benefit of the rule governing transactions between client and attorney, and be relieved on principles of public policy. Whether Roman, in his character of attorney, was retained, at the commencement of the transaction, as the legal adviser of Mali, certainly admits of great doubt upon the proof before us. Mali himself has sworn positively that Roman was not his attorney. But if it be conceded that the relation of client and attorney did exist, then it is manifest that Mali had but one object in retaining Roman as his counsel, and that was to obtain the aid and assistance that the latter could render in evading and defrauding his, Mali's, creditors; and though Roman was the more active of the two in planning and executing the fraud, yet Mali was all the while approving and co-operating in it, and supported it throughout. Both were, therefore, in the contemplation of law, equally guilty; and the counsel for the appellee do not deny, " that the evidence shows that Roman and Mali were parties to a miserable fraud, conceived in sin, and matured on perjury." It is also conceded by the counsel for the appellee that neither party has shown any right *in himself* which a Court of justice ought to respect, and in this we entirely agree.

Such, then, being the case, it falls directly within the well established principle, that he who comes into equity must come with clean hands ; and if a party seeks to cancel or set aside an instrument, or be relieved of a transac-

tion, or recover property, on the ground of fraud, and he himself has been guilty of a wilful participation in the fraud, equity will not interpose in his behalf. This principle, it has been said, is founded in the soundest wisdom and policy of the law, and it has been applied and enforced by the Courts with great uniformity. It was upon this principle that the Supreme Court of the United States acted in the case of *Creath vs. Sims*, 5 *How.*, 192. In that case the Court said: "The complainant alleges, that the obligation to which he had voluntarily become a party was intentionally made in fraud of the law, and for this reason he prays to be relieved from its fulfilment. This prayer, too, is preferred to a Court of conscience, to a Court which touches nothing that is impure. The condign and appropriate answer to such a prayer from such a tribunal is this,—that, however unworthy may have been the conduct of your opponent, you are confessedly *in pari delicto;* you cannot be admitted here to plead your own demerits ; precisely, therefore, in the position in which you have placed yourself, in that position we must leave you." And so we say to the appellee here.

*Motion for re-argument denied.*

(Decided 16th December, 1875.)