624 A.2d 1319

**Janet Marie SCHNEIDER**

v.

**Mark Reynolds SCHNEIDER.**

**No. 1385, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

May 28, 1993.

Barry J.C. Kissin, Frederick, for appellant.

William R. Nicklas, Jr. (Doherty, Elliot & Nicklas, P.A., on the brief), Frederick, for appellee.

Argued before ALPERT, CATHELL and DAVIS, JJ.

ALPERT, Judge.

This is yet another case which has its genesis in the disintegration of the respective parties' marital relationship. Janet Marie Schneider ("Janet"), appellant, appeals from a judgment of the Circuit Court for Frederick County (G. Edward Dwyer, Jr., J., presiding) in favor of her ex-husband, Mark Reynolds Schneider ("Mark"), appellee. Specifically, the circuit court dismissed Janet's Complaint for Specific Performance; Janet now appeals asking us to address a single question:

> Did the court below err in dismissing [without a trial on the merits] appellant's complaint under the doctrine of unclean hands?

We answer this question in the negative, and therefore affirm.

## I.

In 1966, Janet and Mark married. Two children were born of the marriage, a daughter in 1967 and a son in 1972. Then, on July 15, 1990, Mark moved out of the marital home and the couple's marriage, for all intents and purposes, was over; divorce was soon to follow.

Four days after he moved out, *i.e.*, on July 19, 1990, Mark returned briefly to the marital home and left for Janet a four-page, handwritten letter. In the letter, Mark discussed the couple's financial situation. As part of that discussion, Mark requested Janet to "[d]o what you have to to sell the [marital] house," and that if the house would sell for more than a certain specified amount, "I [Mark] could send you [Janet] $400.00 or $500.00 every two week[s or] 24 times a year or $10,000.00+ per year." Moreover, during this approximate time period (*i.e.*, late July, 1990), Mark also allegedly promised that he would continue to keep Janet as the primary beneficiary on his life insurance policies. Janet alleged that she relied on Mark's two financial representations (*being,* (1) the twice-monthly payments, and (2) remaining his life insurance beneficiary) and, in so relying, she abstained from seeking alimony or other monetary relief from Mark.

On August 7, 1990, Janet filed in the Circuit Court for Frederick County a "Complaint for Absolute Divorce" on the grounds of Mark's alleged adultery. Janet described the facts supporting Mark's adultery thusly:

On July 15, 1990, [Janet] went by herself to church as she ordinarily does every Sunday. She left at the normal time, 8:00 AM, but returned home somewhat early because there was a visiting priest. At approximately 9:45 AM, she entered the bedroom she shared with [Mark]. She had in mind changing into her McDonald's uniform as she was scheduled to begin work at McDonald's that morning at 11:00 AM. *She found [Mark] in bed with a blonde-haired woman. [Janet] was flabbergasted, managed to say something like, "Get out of the house", and went downstairs. [Mark] came down stairs and stated that he would be moving out. [Mark] left that day and never slept under the roof of the marital home again.*

(Emphasis added.) In his Answer to Janet's Complaint, Mark confirmed the validity of the facts surrounding his adultery and, accordingly, on August 31, 1990, a Judgment of Absolute Divorce was entered in favor of Janet. Consistent with her allegations, Janet sought neither alimony nor other monetary

relief; instead, (she contends) she simply relied on Mark's two aforementioned financial "promises."

Apparently consistent with his alleged promises, Mark did, in fact, make several $400 payments to Janet. But (according to Janet) the payments soon stopped, Mark "prompt[ly] removed" Janet as his life insurance beneficiary, and, eventually, Janet looked to the legal system to enforce Mark's alleged contractual promises.

On or about August 27, 1991, in attempting to enforce Mark's promises, Janet filed legal papers in two separate but concurrent cases. On the one hand, as part of her divorce case, she filed a "Motion to Revise Judgment," wherein she requested the circuit court to reopen the Judgment of Absolute Divorce "to receive additional evidence and then enter a new judgment that awards Plaintiff [Janet] alimony." On the other hand, Janet also initiated (in the same court) a completely separate civil action which she captioned as a "Complaint for Specific Performance," wherein she sought specific performance of Mark's two financial promises.

Janet stated the relationship between her two concurrent cases as follows:

As stated in [the] Motion [to Revise Judgment], [Janet's] first choice of remedy is specific performance. However, if for any reason this Court declines to order specific performance, [Janet's] only recourse would then be a reopening of the divorce case.

Moreover, pursuant to delineated paragraph six of her Complaint for Specific Performance, Janet noted:

For a description of the surrounding circumstances and the conduct of the parties, Plaintiff [Janet] hereby adopts by reference and requests to have incorporated herein the contents of her "Motion to Revise Judgment", which Motion is being filed in [the divorce case] at the same time as this Complaint is being filed.

The Motion to Revise Judgment, of course, had in turn made express reference to the previous divorce proceedings includ-

ing, not surprisingly, Mark's adultery upon which the divorce had been granted.

On or about February 25, 1992, Mark filed a Motion to Dismiss (which Motion was interpreted as applying to both of Janet's concurrent cases). The heart of the Motion—indeed, the heart of this case—lies in its delineated paragraph 9:

> That the Complaint [for Specific Performance] seeks equitable relief, for which the Plaintiff [Janet] has unclean hands as paragraph six [of the Complaint] incorporates the contents of her original Motion to Revise Judgment, *which said Motion was based upon perjured testimony.*

(Emphasis added.)

*Perjured testimony?* As Janet subsequently explained in her "Amended Motion to Revise Judgment by Interlineation," the events which precipitated the parties' divorce had occurred in a slightly different fashion than (1) she had originally alleged in her Complaint for Absolute Divorce, and (2) she had reiterated in her aforementioned Motion to Revise (and incorporated by reference into her Complaint for Specific Performance):

> On July 15, 1990, [Janet] went by herself to church as she ordinarily does every Sunday. She left at the normal time, 8:00 AM, but returned home somewhat early because there was a visiting priest. At approximately 9:45 AM, she entered the bedroom she shared with [Mark]. *She did not at that time, as stated in Paragraph # 2 of the original Motion to Revise Judgment, find [Mark] in bed with another woman. [Instead, Mark] at that time told [Janet] to use the truck for transportation to work at McDonald's in Thurmont. When [Janet] asked why, [Mark] replied that he was using the car to go find another place to live in Frederick. At approximately noon of the same day, [Mark] appeared at the McDonald's where [Janet] was working and told her that he had found a place to move into.*

(Emphasis added.)

A hearing on Mark's Motion to Dismiss (vis-a-vis both of Janet's concurrent cases) was held on May 14, 1992 before

Judge Dwyer. With respect to Janet's "Motion to Revise Judgment," the court held

> Quite frankly, I think the motion to dismiss properly lies in that case. I think if there is any fraud that it's intrinsic fraud and in addition to the intrinsic fraud, quite frankly, unclean hands is so applicable in that case, I mean that's the basis for her getting that divorce was her perjured testimony, which she admits. I am going to grant, for both reasons, the fact that it's intrinsic as opposed to extrinsic and because the unclean hands is so applicable in the divorce action that the motion to dismiss in that case is granted.

With respect to Mark's Motion to Dismiss Janet's "Complaint for Specific Performance," the court heard arguments from both parties, but reserved judgment until it had reread the case of *Manown v. Adams*, 89 Md.App. 503, 598 A.2d 821 (1991), *rev'd on other grounds as Adams v. Manown*, 328 Md. 463, 615 A.2d 611 (1992), a significant and recent case concerning the "unclean hands" doctrine. After rereading *Manown*, the court, on June 12, 1992, issued a written Order which granted Mark's motion (and thereby dismissed Janet's Complaint). In dismissing the Complaint, the court held as follows:

> Janet Marie Schneider has admitted, both in these proceedings and in [the divorce case], that in the divorce proceeding .... in which she was the Plaintiff, that the divorce was granted to her on the grounds of adultery as a result of perjured testimony by her.
>
> The oral agreement which she seeks to enforce in this matter encompasses matters which could have been heard in the divorce case[.]
>
> Under *Manown v. Adams*, 89 Md.App. 503 [598 A.2d 821] (1991), it appears to be discretionary with the Court as to whether or not the Court should dismiss a matter under the doctrine of unclean hands. * * * *
>
> In this case, the matters which the Plaintiff [Janet] attempts to litigate in this matter could and should have been disposed of in the divorce action. Where the Plaintiff

obtained her divorce on admittedly perjured testimony, this Court refuses to recognize her action in this case under the doctrine of unclean hands.

It is from this written Order (vis-a-vis her Complaint for Specific Performance) that Janet appeals.[1]

## II.

Recently, both we and the Court of Appeals have had occasion to examine the law concerning the doctrine of unclean hands. Both examinations arose from a single case, *Manown, supra.*

*Manown* concerned the relationship between one J. Stephen Adams ("Adams") and one Patricia J. Manown ("Manown"). After separating from his wife, but before his divorce was final, Adams commenced both a personal and business relationship with Manown. Consequently, Adams "invested" significant financial assets into their ventures. Because Adams anticipated the divorce action, and, accordingly, because he wanted to secrete these assets from the divorce proceedings, Adams' transferred assets were titled in Manown's name only. These secreted assets included, *inter alia*, $43,000 in cash (which Adams had accumulated over some unspecified time, and which he had kept in a safe deposit box) which was used toward the purchase of a home in Manown's name only; the couple was to use this home as both their dwelling and their place of business.

Not long after his divorce was final, Adams filed a voluntary petition in bankruptcy. In his schedules filed in bankruptcy, *and despite his business dealings with Manown*, Adams swore that he had no interest in property held by another and

---

1. While the circuit court dismissed Janet's claims in both the divorce proceeding (*i.e.*, the Motion to Revise Judgment) and the separate civil proceeding (*i.e.*, the Complaint for Specific Performance), Janet's "Notice of Appeal" noted an appeal only "in the above-captioned case," *i.e.*, the Complaint for Specific Performance. Moreover, in her brief before this court, Janet stated that her appeal was from the "June 15, 1992 ... ruling," (the June 12th Order was filed on June 15, 1992,) which applied only to the Specific Performance case.

that he had no interest in any partnerships. Shortly thereafter Adams was discharged from his debts, and his bankruptcy case was closed.

Meanwhile, Adams' and Manown's relationship soured. Approximately four months after his discharge in bankruptcy, Adams filed suit against Manown. The gist of the Complaint was that Adams was seeking recovery from Manown for the very funds in which he had denied any interest in his two previous proceedings (*i.e.*, the divorce and the bankruptcy). Manown defended on the grounds that Adams was coming into court with "unclean hands" and that his action should therefore be barred. The Circuit Court for Washington County declined to apply the unclean hands doctrine, and a subsequent jury verdict came down in favor of Adams and against Manown in the amount of $43,000. Manown appealed to us, and we reversed; in essence, we held that the circuit court *should* have applied the unclean hands doctrine. *Manown,* 89 Md.App. at 516, 598 A.2d 821. Adams then appealed our decision to the Court of Appeals which, though it reversed the case on wholly unrelated grounds, provided the Court with its opportunity to address the state of the law regarding unclean hands. *See Adams v. Manown,* 328 Md. 463, 474–76, 615 A.2d 611 (1992).

With respect to the unclean hands doctrine, our introductory discussion in *Manown* applies equally to the case at bar:

> The unclean hands doctrine refuses recognition and relief from the courts to those guilty of unlawful or inequitable conduct pertaining to the matter in which relief is sought. The doctrine is not for the protection of the parties to a lawsuit, but rather, for the protection of the courts—the idea being that judicial integrity is endangered when judicial powers are interposed to aid persons whose very presence before a court is the result of some fraud or inequity. The doctrine also serves another purpose which was stated long ago by the Court of Appeals in a case with facts parallel to this one:
>
> > The suppression of such illegal and fraudulent transactions is far more likely, in general, to be accomplished by

leaving the parties without remedy against each other, and thus introducing a preventative check, than by enforcing them at the instance of one of the parties to the fraud[.]

*Roman v. Mali*, 42 Md. 513, 533–34 (1875). Thus where there is evidence of willful wrongdoing in relation to the controversy before it, the doctrine allows a court to literally wash its hands of the affair, leaving the guilty party or parties to the consequences of their actions.

*Manown*, 89 Md.App. at 511, 598 A.2d 821 (other citations omitted). In the context of that introduction, we also noted that the question of whether the principle is to be invoked in a particular case rests in the sound discretion of the trial court. *Id.* (*citing Space Aero Products Co. v. Darling*, 238 Md. 93, 120, 208 A.2d 74, 699 *cert. denied*, 382 U.S. 843, 86 S.Ct. 77, 15 L.Ed.2d 83 (1965)). We concluded,

While the unclean hands doctrine may involve factual questions, its purpose is to protect institutional interests. It is therefore the judge, who is capable of identifying such interests and weighing them against other considerations, who must determine when the doctrine should be invoked to bar a claim.

*Id.* 89 Md.App. at 513, 598 A.2d 821 (*citing Niner v. Hanson*, 217 Md. 298, 309, 142 A.2d 798 (1957)).

In reversing *Manown* on other grounds[2], the Court of Appeals reiterated much of the law set forth in *Manown*, as well as added the following:

"It has been also said that the maxim [*i.e.*, that the doctrine is applied for the court's own protection] has nothing to do with disapproval of the character or past behavior of the applicant but only with the effect of his present application." *Niner*, 217 Md. at 309 [142 A.2d 798]. "Equity does not

---

**2.** While application of the unclean hands doctrine formed the basis of the decision in both the circuit court and our court, the Court of Appeals reversed "on a totally different issue, *i.e.*, 'that the trustee in bankruptcy, and not the petitioner [Adams], is the real party in interest as plaintiff.'" *Adams*, 328 Md. at 483, 615 A.2d 611 (Chasanow, J., concurring and dissenting; *quoting* 328 Md. at 465, 615 A.2d 611).

demand that its suitors shall have led blameless lives." *Id.* (*quoting Loughran v. Loughran,* 292 U.S. 216, 229 [54 S.Ct. 684, 689, 78 L.Ed. 1219] (1934)). Thus, an important element of the [un]clean hands doctrine is that the alleged misconduct must be connected with the transaction upon which the claimant seeks relief.

*Adams,* 328 Md. at 475, 615 A.2d 611. With respect to this requisite "nexus" between the misconduct and the transaction at issue, the Court adopted the language set forth by D. Dobbs, *Remedies,* § 2.4, at 46 (1973):

It is only when the plaintiff's improper conduct is the *source, or part of the source,* of his equitable claim, that he is to be barred because of this conduct. "What is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts."

*Adams,* 328 Md. at 476, 615 A.2d 611 (*quoting Dobbs, supra*; emphasis added here).

 From the history of the *Manown/Adams* cases, we therefore surmise the following as "black letter" law:

1. That the court has the power to refuse recognition and relief to those guilty of unlawful conduct pertaining to the matter in which relief is sought. *Manown,* 89 Md.App. at 511, 598 A.2d 821 (emphasis added).

2. That it is only when the plaintiff's improper conduct is *the source, or part of the source,* of his equitable claim, that he is to be barred because of this conduct. *Adams,* 328 Md. at 476, 615 A.2d 611. This power (to bar a claim because of the plaintiff's improper conduct) is properly exercised to protect the court's integrity from persons whose very presence before the court is the result of some fraud or inequity, and not to punish the wrongdoing party or parties. *Adams,* 328 Md. at 474–75, 615 A.2d 611; *Manown,* 89 Md.App. at 511, 598 A.2d 821;

3. That, while the doctrine may involve factual questions, it is the court that must determine when the doctrine

should be invoked to bar a claim. *Manown,* 89 Md.App. at 513, 598 A.2d 821; and

4. That, absent an abuse of discretion, we won't disturb a trial court's decision to invoke the doctrine. *Id.* at 511, 598 A.2d 821.

With these rules of law in mind, we now turn to the particulars of the case at bar.

## III.

It is undisputed that Janet committed perjury in order to expedite the processing of her and her ex-husband's divorce. Such perjury is sufficient to support the doctrine's threshold requirement that the party (who is sought to be denied access to the courts) had engaged in unlawful or inequitable conduct. *See Manown,* 89 Md.App. at 511, 598 A.2d 821.

It is also clear that Janet's perjury is "the source, or part of the source" of her equitable claim. We note that this nexus (between her perjury and her claim) is apparent in two parallel, though distinguishable, ways.

First, one of the very foundations of Janet's argument on appeal was that her Complaint for Specific Performance did, indeed, relate to her divorce proceeding. In this regard she argues as follows:

> Dismissing an action on preliminary motion on the basis of the unclean hands is rarely appropriate. *This is particularly true in matrimonial litigation.*

Appellant's Brief at 5 (emphasis added). And,

> Undersigned counsel could find no reported Maryland appellate decision in which application of the unclean hands doctrine *in a divorce or matrimonial type litigation* was affirmed.

*Id.* at 8[3]. Janet also cites several law review articles as relating to the subject of this litigation. While we do not believe that the specific arguments raised in the cited articles are on point with the facts at bar, we *do* believe that, by the very act of citing to the following two articles, Janet has acknowledged the obvious nexus between her divorce (which was procured through the subject perjury) and her instant Complaint: Chafee, *Equity and Unclean Hands,* 47 Mich. L.Rev. 1065 (1949) (regarding *"Matrimonial litigation "*) and Malkan, *Petitioner's Fault in Matrimonial Actions,* 106 Pa. L.Rev. 52 (1957). That is, by describing her Complaint for Specific Performance as part of a "matrimonial action," we believe that she is admitting the undeniable nexus between the divorce proceeding (and, therefore, her perjury) and her Complaint for Specific Performance.

Second, and perhaps more significantly, Janet's Complaint for Specific Performance sought enforcement of two alleged contracts between Mark and her. As Janet herself admitted in her Response to Mark's Motion to Dismiss,

> The consideration for [these two contracts] was that Plaintiff [Janet] would prosecute a divorce action in the Circuit Court for Frederick County in which she would make no claims for any form of financial relief. Plaintiff [in the aforesaid divorce action] complied with her obligations under the parties' agreement.

In short, Janet admitted that the consideration supporting the two alleged contracts at issue was both (1) *the act of perjury itself* (*i.e.,* the prosecution of the divorce action, which was grounded in adultery), and (2) an act that occurred as a *direct result* of said perjury (*i.e.,* in the divorce action, her making no claim for any form of financial relief).

We therefore believe that, at present, it is sufficiently clear that Janet's perjury is "the source, or part of the source" of

---

**3.** Despite Janet's assertions to the contrary, we note that there *do* exist cases where the unclean hands doctrine *was* applied to matrimonial litigation. *See, e.g., McClees v. McClees,* 162 Md. 70, 80–81, 158 A. 349 (1932); *Childs v. Childs,* 49 Md. 509, 513 (1878).

her equitable claim for Specific Performance. *See Adams,* 328 Md. at 476, 615 A.2d 611.

Given (1) that the court has the power, as a matter of law, to refuse recognition and relief to those guilty of unlawful conduct, (2) that it is undisputed the Janet engaged in such conduct, (3) that Janet's unlawful conduct was the source, or part of the source, of her equitable claim for Specific Performance, we shall defer to the trial court's discretion to invoke the doctrine of unclean hands and, accordingly, we shall affirm that court's decision to dismiss Janet's Complaint.

## IV.

Janet raises four arguments in support of her contention that the court below erred in dismissing (without a trial on the merits) her complaint.

## A.

First, Janet argues (as aforementioned) that dismissing an action on preliminary motion on the basis of the unclean hands is rarely appropriate, and that this is particularly true in matrimonial litigation. We have already held that, *under the facts and circumstances presented herein,* the court acted within its discretion by dismissing Janet's Complaint. Moreover, even assuming, without so holding, that a higher standard *did* apply to "matrimonial litigation," we refuse to characterize the present case as "matrimonial" in nature.

While we recognize, under the unique facts presented in this case, that there is an *undeniable* connection between the "underlying" divorce action and Janet's Complaint for Specific Performance[4], the essence of Janet's Complaint lies wholly within the ordinary world of contract law. The Complaint (which forms the basis of the appeal currently before us) was brought in an independent action in equity, separately cap-

---

**4.** Specifically, and by her own admission, Janet's prosecution of the divorce action constituted part of the consideration for the alleged contract sought by her to be specifically performed.

**310**

tioned and legally distinct from Janet's and Mark's previous divorce proceedings. The allegations set forth therein sound in the language of standard contract: a written promise, an oral promise, consideration, compliance by the non-breaching party, partial performance and breach by the other party. In addition, the prayers set forth therein make no reference to the divorce proceedings.

### B.

Second, Janet contends that there is an insufficient nexus between her perjury and her Complaint for Specific Performance. We disagree. Inasmuch as we have already fully discussed the existence of this nexus, we need not reiterate that discussion here.

### C.

Third, Janet argues that "[t]he unclean hands doctrine should not have been applied in this case not just because [Mark] committed the same wrong, but also because [Janet's] wrongful conduct came about as a result of oppressive influence exerted by [Mark]." Even assuming, *arguendo*, that Janet had preserved this issue for appeal,[5] we disagree.

---

**5.** The record reflects that it is only now, for the first time on appeal, that Janet has alleged that her *wrongful conduct* (*i.e.*, her perjury) resulted from Mark's allegedly "oppressive and undue" influence upon her.

Significantly, in her brief before this court, her argument fails to include even a single reference to the record which evidences any such undue influence or oppression. *See* Appellant's Brief at 15–18. The closest she comes is perhaps in the "Statement of Facts" section of her brief, wherein she cites to a single paragraph in her "Motion to Revise Judgment." This cited paragraph reads as follows:

6. The defendant [Mark] *dominated* the Plaintiff [Janet] throughout their marriage. The Defendant completely controlled the parties' finances. The Defendant not only dictated with respect to money matters—his was the final word on children issues and on the matter of what Plaintiff did with her life. For example, in March of 1990, the Defendant was concerned about being diagnosed diabetic. He therefore insisted that Plaintiff surrender her real estate license and her job selling real estate with ERA Van Meter in Hagerstown so that she would be able to provide regular meals and otherwise be able to

In support of her position, Janet calls our attention to the venerable case of *Roman v. Mali*, 42 Md. 513 (1875), which she cites as standing for the following proposition:

> There may be different degrees of guilt as between the parties to the fraudulent or illegal transaction; and if one party act[s] under circumstances of oppression, imposition, undue influence, or at great disadvantage with the other party concerned, so that it appears that his guilt is subordinate to that of the defendant, the court, in such case, will relieve.

*Id.* at 532.

The quote, however, continues on beyond the passage cited by Janet:

> But we have examined the record in this case in vain to find any *evidence* whatever of those circumstances that should entitle [the plaintiff] to the benefit of the exception to the general rule. On the contrary, * * * * [t]*he whole transaction, from the beginning to the end, was the joint scheme of the two, the one co-operating with the other, and both being equally guilty, [of the unlawful act in question].*

*Id.* (emphasis added).

As in *Roman,* we too do not "find any evidence whatever of those circumstances that should entitle [Janet] to the benefit

---

better care for the Defendant. Two months after Plaintiff complied with this, Defendant suddenly decided the Plaintiff needed to return to some job that would allow the Plaintiff to be home when the Defendant needed her. The Defendant suggested McDonald's in Thurmont. Plaintiff complied.

Appellant's Brief at 4 (*citing* her "Motion to Revise Judgment") (emphasis added).

It is unlikely that the description of Mark's alleged *"domination"* rises to a level sufficient to support an alleged *undue influence* or *"oppressiveness"* claim. It is well established that

undue influence is not, of course, every mere entreaty or pressing solicitation that may be invoked to sway the conduct or to persuade the judgment of another; but it is that degree of importunity which deprives one of his free agency—such as he is too weak or too feeble to resist, and such as will render the instrument executed under its supremacy not his free and unconstrained act.

*Frush v. Green,* 86 Md. 494, 501, 39 A. 863 (1897); *see also Benedict v. Warehime,* 187 Md. 150, 158, 49 A.2d 444 (1946).

of the exception to the general rule." On the contrary, the whole transaction (*i.e.*, the perjury), from beginning to the end, appears to be the joint scheme of the two, the one cooperating with the other, and both being equally guilty.

Indeed, in Janet's "Response to [Mark's] Motion to Dismiss," Janet gave every indication that her decision to prosecute a divorce action based on fraudulent grounds was not only voluntary, *but actually served as part of the bargained-for consideration underlying the very contract for which she was presently seeking enforcement.* As she stated:

> The consideration for [Mark's] aforesaid promises was that [Janet] would prosecute a divorce action [based on the fraudulent ground of adultery] in the Circuit Court for Frederick County in which she would make no claims for any form of financial relief. [Janet] complied with her obligations under the parties' agreement.

### D.

■ Finally, Janet, relying on *Thomas v. Klemm*, 185 Md. 136, 43 A.2d 193 (1945), contends that the "unclean hands doctrine does not apply [ (1) ] because [Mark] was not injured by [Janet's] prior perjury and [ (2) ] because [Janet's] wrongdoing did not result in any benefit to her."

The simple response to the former contention, *i.e.*, that Mark was not injured, is, as the Court of Appeals held in *Adams*, that "[t]he clean hands doctrine is not applied for the protection of the parties nor as a punishment to the wrongdoer; rather, the doctrine is intended to protect the courts from having to endorse or reward inequitable conduct." *Adams*, 328 Md. at 474–75, 615 A.2d 611. In other words, where, as here, the plaintiff's fraud was perpetrated exclusively on the court, and not on the defendant, we believe that the court may indeed properly invoke the doctrine.

The simple response to the latter contention, *i.e.*, that Janet didn't benefit from her wrongdoing, is that Janet's wrongdoing *did* result in an *intended* benefit to her; she was able to obtain an expedited divorce from Mark.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.