644 A.2d 510

**Janet Marie SCHNEIDER**

v.

**Mark Reynolds SCHNEIDER.**

**No. 98, Sept. Term, 1993.**

Court of Appeals of Maryland.

July 18, 1994.

Barry J.C. Kissin, Frederick, argued for petitioner.

William R. Nicklas, Jr., argued and on brief (Mary Ann Ferguson, Doherty, Elliot & Nicklas, P.A., on brief), Frederick, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

Here, a divorced woman sought specifically to enforce against her former husband a contract for support that was not referred to in the divorce decree. The circuit court dismissed the plaintiff's complaint under the clean hands doctrine, because the complaint revealed that she had testified falsely in the divorce action as to the grounds for divorce. For the reasons explained below, we shall reverse.

The petitioner, Janet Marie Schneider (Janet), and the respondent, Mark Reynolds Schneider (Mark), were divorced *a vinculo* by a decree of the Circuit Court for Frederick County dated August 31, 1990. Janet was the plaintiff in that action. Two children had been born of the marriage, a daughter who was an adult at the time of the divorce, and a son who reached age eighteen on November 13, 1990. The decree provided for the absolute divorce of the parties, awarded custody of the son to Janet, charged Mark generally with the son's support, and made no other provisions.

Almost one year later Janet filed the subject "Complaint for Specific Performance" in the Circuit Court for Frederick County, thereby initiating a separate civil action. At the same time she also filed a motion to revise the final judgment in the divorce action. The complaint for specific performance incorporated by reference the allegations in the motion to revise the judgment in the divorce action. As originally filed, the motion to revise restated the purported facts of the adultery on which the divorce had been grounded, namely that on July 15, 1990, Janet had returned home from church to find her husband in bed with a blond-haired woman.

On November 22, 1991, Janet filed in the divorce action an amended motion to revise the judgment, and at the same time she amended the complaint in the instant specific performance action to incorporate the amended motion to revise the judgment. In the amended motion Janet acknowledged that she had not found her husband in bed with another woman.

Because judgment in this case was entered by the circuit court's dismissal of the amended complaint, we look to its allegations for the facts on which the circuit court's conclusion of law was based. In so doing

> "we must assume the truth of all relevant and material facts that are well pleaded and all inferences which can be reasonably drawn from those pleadings. On the other hand, any ambiguity or uncertainty in the allegations bearing on whether the complaint states a cause of action must be construed against the pleader."

*Sharrow v. State Farm Mutual Auto. Ins. Co.*, 306 Md. 754, 768, 511 A.2d 492, 500 (1986) (citation omitted).

The parties were married in 1966. Two years later Mark received his bachelor's degree and, in 1976, a master's degree. "While the Defendant was going to school, the Plaintiff was raising the children during the day and working at night."

Mark is vice principal of a public elementary school in the City of Frederick, and he is also in charge of Frederick County's summer school program. He earns approximately $50,000 per year. For some unspecified period of time Janet had been a licensed real estate salesperson with a broker in Hagerstown.

Mark "dominated the Plaintiff throughout their marriage [and] completely controlled the parties' finances." He "not only dictated with respect to money matters—his was the final word on children issues and on the matter of what Plaintiff did with her life." In March 1990, Mark was diagnosed as a diabetic. He "insisted that Plaintiff surrender her real estate license and her job selling real estate ... so that she would be able to provide regular meals and otherwise be able to better care for the Defendant." Janet complied.

Two months later Mark "suddenly decided the Plaintiff needed to return to some job that would allow [her] to be home when the Defendant needed her. The Defendant suggested McDonald's in Thurmont. Plaintiff complied." The job at McDonald's paid $5.00 per hour.

On Sunday, July 15, 1990, Mark told Janet that he was going to look for a place in Frederick where he would live separately.[1] Mark returned to the home on July 19 in order to pick up some belongings, and he left a four-page, longhand letter with instructions. That letter in part reads: "I could send you $400.00 or $500.00 every two week[s] 24 times a year or $10,000.00+ per year as long as you need it or more[.]" The theory of the instant complaint is that this portion of the note evidences a contract to pay spousal support.

Janet alleges that on or about July 21, 1991, Mark telephoned her demanding that a family conference be arranged. He also told her that he "wanted a fast divorce because he did not want to waste another 18 months of his life [and] that the only way to obtain a fast divorce would be on the ground of adultery." Janet "replied that she would prefer a legal separation. Ultimately, however, [she] acquiesced and agreed to obtain a divorce on the grounds of adultery."

Shortly after July 21 the parties met with their children. Mark told them that the parties had "agreed to divorce, that there was no fault involved ... and that if the children happened to see in the newspaper that their mother was obtaining a divorce on the grounds of adultery, that that was only so the divorce could be obtained without a long waiting period."

After Mark had dismissed the children from the meeting, he told Janet that he did not want an attorney involved. Janet expressed the view "that it would take the assistance of an

---

1. In the amended complaint filed November 22, 1991, Janet averred that "the parties have been continuously separate and apart by mutual and voluntary agreement for a period of more than 12 months...." Thus, it is not contended that Mark's departure from the marital abode constituted desertion.

attorney to accomplish dissolution of the marriage." Mark agreed to have an attorney " 'handle the divorce part,' " but that the parties would " 'handle the settlement part,' " telling Janet, " 'I've already told you what I will do. You have it in writing.' " At that same meeting Mark promised to continue Janet as the primary beneficiary on his two life insurance policies. The benefit under one is $100,000. Under the other the benefit is twice Mark's salary from the Board of Education.

Janet hired an attorney "to prosecute an uncontested divorce that merely dissolved the marriage." She "relied upon Defendant's assurances that he would supply the necessary financial assistance," and she "abstain[ed] from seeking alimony and other relief." Her complaint for divorce, alleging adultery, was filed August 7, 1990. It appears from the statements of present counsel, but not as a matter of record in this appeal, that Mark answered pro se and under oath, admitting the allegations, and that Janet and a corroborating witness testified before an examiner. Janet avers that she

"does not believe there is any excuse for having participated in misleading the Court as to grounds for divorce. Mitigating circumstances include that she was very sick to the point of being ill from the tensions incident to her relationship with Defendant. Plaintiff was also physically afraid of Defendant."

The divorce decree was entered August 31.

Mark made two payments of $400 each to Janet in October 1990, and he made one payment of $400 in November 1990. Thereafter he refused to make any payments. At some point Janet also discovered that her former husband had removed her as beneficiary on his life insurance policies. In June 1991, Janet requested assistance from Mark to enable her "to go back to school so that she could qualify to teach elementary school." He "suggest[ed] that she apply to Social Services for help. The Plaintiff had already done that and was found to be ineligible."

Janet gave up working at McDonald's in May 1991. When the complaint was filed in August of that year, she was doing "some" home teaching, and she worked twenty hours per week taking care of elderly nuns for which she was paid $5.75 per hour.

■ The complaint and the contemporaneously filed motion state that her "first choice of remedy is specific performance." [2] Mark moved to dismiss the complaint on multiple grounds, including unclean hands. The circuit court granted that motion after concluding:

"In this case, the matters which the Plaintiff attempts to litigate ... could and should have been disposed of in the divorce action. Where the Plaintiff obtained her divorce on admittedly perjured testimony, this court refuses to recognize her action in this case under the doctrine of unclean hands." [3]

Janet appealed to the Court of Special Appeals which affirmed the dismissal. *Schneider v. Schneider*, 96 Md.App. 296, 624 A.2d 1319 (1993). On that appeal Janet's principal arguments were that (1) dismissal on the pleadings, based on

---

**2.** Although "[g]enerally speaking courts do not decree specific performance of agreements to pay money ... an exception to this exists in agreements between husband and wife for payment of alimony or support." *Williams v. Williams*, 305 Md. 1, 8, 501 A.2d 432, 435 (1985). *See also Brown v. Brown*, 278 Md. 672, 366 A.2d 18 (1976); *Zouck v. Zouck*, 204 Md. 285, 104 A.2d 573 (1954); J. Fader & R. Gilbert, *Maryland Family Law* § 16.11 (1990).

**3.** We interpret the trial court's statement that the claim for support "could and should have been disposed of in the divorce action" to describe a connection between the specific performance action and the divorce action. It is not a determination that the specific performance action is barred by *res judicata*. The alleged support agreement between Mark and Janet was not presented to the court in the divorce action, and there was no adjudication at all concerning it. We have held that *res judicata* does not bar a subsequent suit for specific performance of a spousal support agreement, if specific performance had been denied in a prior action based on an exercise by the court of its discretion and not based on a determination that there were no ultimate rights under the agreement. *See Shacter v. Shacter*, 251 Md. 304, 247 A.2d 268 (1968); *see also Brown v. Brown*, 278 Md. 672, 366 A.2d 18 (1976).

unclean hands, is rarely appropriate, particularly in matrimonial litigation, (2) a sufficient nexus between her inequitable conduct and the relief sought was lacking, and (3) although both parties committed the same wrong, her conduct resulted from oppressive influence by Mark.

As to Janet's first contention, the Court of Special Appeals "refuse[d] to characterize the present case as 'matrimonial' in nature," viewing it, rather, as a "standard contract" action. *Id.* at 309–10, 624 A.2d at 1326.[4]

On the nexus issue, the intermediate appellate court held that Janet's perjury was "the source, or part of the source," of her claim. The court explained:

> " 'It is only when the plaintiff's improper conduct is the source, or part of the source, of his equitable claim, that he is to be barred because of his conduct. "What is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts." ' "

*Id.* at 306, 624 A.2d at 1325 (*quoting Adams v. Manown*, 328 Md. 463, 476, 615 A.2d 611, 617 (1992), *quoting* D. Dobbs, *Remedies* § 2.4, at 46 (1973)).

Two reasons satisfied the Court of Special Appeals that the requisite nexus existed between the perjury and the claim asserted in the complaint. First, the court took the view that Janet had admitted the nexus by describing her complaint for support as "matrimonial" litigation. 96 Md.App. at 308, 624 A.2d at 1325. More significant to the Court of Special Appeals was a statement in Janet's trial court memorandum opposing Mark's motion. After referring to the promises to pay support and to continue Janet as insurance beneficiary, the memorandum said:

---

**4.** To support her first contention, Janet had referred to Z. Chafee, Jr., *Coming into Equity with Clean Hands*, 47 Mich.L.Rev. 877, 877–906, 1065–96, particularly at 1083–90 (1949), and to G. Malkan, *Petitioners' Fault in Matrimonial Actions*, 106 U.Pa.L.Rev. 52 (1957). This Court would not apply a clean hands defense to a complaint for annulment in *Townsend v. Morgan*, 192 Md. 168, 63 A.2d 743 (1949).

"The consideration for the aforesaid promises was that Plaintiff would prosecute a divorce action ... in which she would make no claims for any form of financial relief."

The court concluded that Janet had thereby

"admitted that the consideration supporting the two alleged contracts at issue was both (1) *the act of perjury itself (i.e.,* the prosecution of the divorce action, which was grounded in adultery), and (2) an act that occurred as a *direct result* of said perjury (*i.e.,* in the divorce action, her making no claim for any form of financial relief)."

*Id.* at 308, 624 A.2d at 1326.

The Court of Special Appeals also rejected Janet's argument that under *Roman v. Mali,* 42 Md. 513 (1875), her inequitable conduct was subordinate to that of her husband. The court viewed the perjury as "the joint scheme of the two, the one cooperating with the other, and both being equally guilty." 96 Md.App. at 312, 624 A.2d at 1327. Once again the court relied on the memorandum opposing dismissal, saying that

"Janet gave every indication that her decision to prosecute a divorce action based on fraudulent grounds was not only voluntary, *but actually served as part of the bargained-for consideration underlying the very contract for which she was presently seeking enforcement."*

*Id.*

We granted Janet's petition for certiorari. Her written and oral arguments to this Court raised all of the issues presented to the Court of Special Appeals.

■ In this case we need not decide, however, whether the doctrine of unclean hands, in the broad sense, has any application to "matrimonial" litigation. That is because the more narrow rule that is expressed in the maxim, *in pari delicto potior est conditio defendentis* (where fault is mutual, the law will leave the case as it finds it), Black's Law Dictionary 711 (5th ed. 1979), is what is involved here. Mark's position, quite simply, is that even if there is an agreement which he has

breached, thereby forcing Janet to seek judicial enforcement of his promise, the Court should not do so because Janet is equally guilty with him of committing perjury in the divorce case. As the following review of prior decisions makes clear, the proper resolution of this case requires considering the policies underlying both the *in pari delicto* rule and the enforcement of agreements for spousal support.

Illustrating the type of ruling that Mark seeks to have applied here is *Baxter v. Wilburn,* 172 Md. 160, 190 A. 773 (1937). There the plaintiff, a married man, purchased a residence where he lived with his mistress for the better part of seven years. The property was titled in the mistress's name in order to defeat the property rights of the plaintiff's wife. The mistress also executed a mortgage to the plaintiff, which was not recorded and of which she retained possession, pursuant to an agreement that the plaintiff would record if his mistress predeceased him. After the parties became estranged, the mistress destroyed the mortgage, and the plaintiff sued to have a lien imposed on the residence in the amount of the mortgage. This Court affirmed a dismissal of the plaintiff's complaint, reasoning that the parties were equally guilty in the "immoral relation." *Id.* at 164, 190 A. at 775. Inasmuch as the defendant was still living, our predecessors noted that "what the complainant seeks is not a performance of the agreement proved, but a remedy for failure of continuation of the relationship in contemplation of which the agreement was made." *Id.* at 163, 190 A. at 774–75. "[T]he connection appear[ed] to this Court so close in fact that the illicit cohabitation must fix the character of the transaction in the property." *Id.* at 164, 190 A. at 775. Thus, the mistress, an equal participant in the "immoral relation," kept the property, free and clear.

*Baxter* may be compared to *Maskell v. Hill,* 189 Md. 327, 55 A.2d 842 (1947). The defendant, Maskell, a married man, and his unmarried mistress lived as man and wife for approximately three years in a residence to which they took title as tenants by the entireties, under false names, by a deed dated August 14, 1937. After they separated in 1940, Maskell

forged and recorded a deed, dated November 5, 1941, purporting to convey the property from them in their false names to himself in his real name. Thereafter Maskell and his legal wife conveyed the property to a straw party who reconveyed to Maskell and his wife as tenants by the entireties. Maskell's former mistress brought suit to remove the cloud on record title created by the forged deed and to obtain a sale in lieu of partition. Maskell demurred, raising a clean hands defense, the demurrer was overruled, and Maskell appealed from that denial, as procedurally permitted at the time.

Our predecessors affirmed, saying:

"Neither on the bill to remove a cloud on her title, nor on a bill for sale in lieu of partition, would the illicit relations between the appellee and Maskell and the morality or immorality of her past life have any relevancy to the title acquired by her under the deed of August 14, 1937. The alleged forged deed of November 5, 1941, was executed according to the bill of complaint after the parties had separated."

*Id.* at 335, 55 A.2d at 845–46.

In *Baxter*, the taint of the transaction, including the unrecorded mortgage, for the purchase of a habitation for the parties' meretricious relationship carried over after they had separated and prevented equity from recognizing the lien of the mortgage. In *Maskell*, on the other hand, if the Court literally were to leave the parties where they found them, the record title to the property would have remained in Maskell and his wife, and the former mistress would be given no relief. The explanation for granting relief to the former mistress in *Maskell* appears to lie in the statement: "Neither law nor morals would be vindicated by permitting a man to steal his former mistress's property by forgery perpetrated after all personal or property transactions between them had come to an end." *Id.* at 335–36; 55 A.2d at 846.

Whether to intervene judicially, or to leave the parties as the Court finds them, is a recurring issue in the decisions of this Court dealing with the *in pari delicto* defense. The

justification for non-intervention is that "[t]he suppression of such illegal and fraudulent transactions is far more likely, in general, to be accomplished by leaving the parties without remedy against each other, and thus introducing a preventive check, than by enforcing them at the instance of one of the parties to the fraud." *Roman v. Mali,* 42 Md. 513, 533–34 (1875). That rationale is fleshed out in a comment on *Baxter:*

"At first glance, this negative behaviour of the courts faced by the problem of an illegal contract might appear somewhat unjust in aiding one malfeasor by allowing him to set up his own wrongdoing as a defense in a suit against him by his opponent, who has the misfortune to be on the wrong side of the legal fence, perhaps purposely placed there by his adversary. [That unintended assistance] is only an incidental result of the maintenance of a more ultimate policy.... Through its application it is claimed that the individual equities, or rather inequities, of the parties are subordinated to the more important considerations of public welfare in general. It is contended that, by refusing any affirmative judicial relief ... there will be less of an incentive to engage in such socially reprehensible conduct."

Note, *Illicit Cohabitation of Parties as Affecting Contracts Made Between Them,* 2 Md.L.Rev. 291, 298 (1938). The essence of the same concept was expressed in *Lord v. Smith,* 109 Md. 42, 71 A. 430 (1908), in these words:

"[Inasmuch] as the refusal of the Court to act always gives the defendant an unfair advantage of the plaintiff, contrary to the real justice of the case, the application of the maxim as a defence is only allowed for reasons of public policy, as a preventive check upon fraud and wrongdoing."

*Id.* at 51, 71 A. at 433.

*Roman v. Mali,* in which this Court split 3–1–3, dealt with an *in pari delicto* defense based upon perjury. 42 Md. at 531–34. Mali was a New York-based entrepreneur whose business activities included the presidency of a corporation that owned coal mines in Allegany County. Roman, a resident of that county, was attorney for the coal company. While Mali was in

Europe in the summer of 1854, the coal company failed, and, upon returning to this country, Mali faced lawsuits by purchasers of watered stock in the company. Anticipating judgments against him, Mali conveyed substantial assets to Roman. When the judgments were obtained and Mali was examined under oath in supplementary proceedings, Mali denied that Roman was his counsel and denied having any interest in the assets. After a receiver brought suit to set aside transfers of assets to Roman, both Mali and Roman denied under oath that Mali had any interest in the property. Years later, after Roman had died, Mali sought to have a trust imposed on the assets which Mali then testified had been held by Roman for Mali's benefit. The equity trial court granted relief, but this Court reversed.

Of significance to the case before us is Mali's attempted avoidance of the *in pari delicto* defense. He claimed that the scheme to defraud creditors was the creation of Roman and that he, Mali, perjured himself on the advice of Roman in whom Mali placed complete confidence. Six judges of this Court recognized that equity would not deny relief unless the parties were *in pari delicto*. Three judges in the majority, *id.* at 532, gave the following statement of the rule, with which the three dissenters agreed, *id.* at 554–55.

"We are not unmindful of the fact, that there are exceptions to the general rule, that Courts of Justice will not actively interpose for the relief of a party who has been *particeps criminis* in an illegal or fraudulent transaction; and that one of the exceptions is, where the party suing, although *particeps criminis,* is not *in pari delicto* with the adverse party. There may be different degrees of guilt as between the parties to the fraudulent or illegal transaction; and if one party act under circumstances of oppression, imposition, undue influence, or at great disadvantage with the other party concerned, so that it appears that his guilt is subordinate to that of the defendant, the court, in such case, will relieve."

Janet argued to the Court of Special Appeals that, under *Roman,* her allegations would, at a minimum, permit her to

produce evidence that she was less blameworthy than Mark. Rejecting this contention, the intermediate appellate court viewed Janet's allegations as factually insufficient to demonstrate undue influence, but the test is not that strict. Janet's complaint alleged, with supporting factual particularity, a marriage in which she was economically dependent on Mark who made her significant personal decisions and who unilaterally made the significant decisions affecting their children. It was also alleged that Mark conceived, and insisted on using, perjured grounds for their divorce and that Janet initially resisted, but later acquiesced, in the perjury. Inasmuch as the *Roman* standard for avoiding *in pari delicto* dismissal is satisfied by "oppression" or by "great disadvantage," Janet should be permitted to produce evidence that she was not *in pari delicto.*

A more substantial reason why dismissal of Janet's complaint should be reversed looks to the policy considerations underlying *in pari delicto. Cronin v. Hebditch,* 195 Md. 607, 74 A.2d 50 (1950), explains how the issue of judicial intervention versus judicial deferral is to be resolved.

> "To determine whether in a particular case the parties are equally at fault, it may be necessary to consider whether the policy of the law would be better promoted by denying recovery or by permitting recovery in whole or in part."

*Id.* at 619, 74 A.2d at 55. The litigation in *Cronin* grew out of the marriage of a seventy-one year old man to an eighteen year old woman. Approximately four months later the bride returned to her parents' home, and four months thereafter she filed for separate maintenance alleging cruelty. Prior to any decree the parties entered into a contract which this Court described as "a palpably unlawful agreement to obtain a divorce" for $1,000 to be paid when the divorce decree was signed, with a balance of $8,000 to be paid in installments over ten years. 195 Md. at 618, 74 A.2d at 52. We said that "[t]he agreement mentions no ground for divorce and seems to imply that none exists and that the divorce bargained for is therefore to be a fraudulent divorce." *Id.* The agreement also

contained a waiver of all of the wife's rights in her husband's property and estate, other than that promised by the agreement. The husband died before any absolute divorce was obtained. In the action brought to enforce her rights as widow, representatives of the husband's estate argued that, if the separation agreement were unlawful, the widow's action should still fail because, as a party to the contract, she was *in pari delicto*. It is in that context that this Court stated the rule, quoted above. In applying the rule we concluded that "the policy of the law would be better promoted by giving plaintiff her marital rights than by consummating the unjust purpose of the agreement by declaring her rights lost." *Id.* at 619–20, 74 A.2d at 55.

*Cronin,* in turn, relied on another case involving an *in pari delicto* defense, *Messick v. Smith,* 193 Md. 659, 69 A.2d 478 (1949), *motion for reargument denied,* 193 Md. 671, 72 A.2d 249 (1950). *Messick* was a mechanic's lien action by a builder and subcontractor against a homeowner, who was a military service veteran.[5] The plaintiff obtained a judgment for the full amount of the claim, after trial on the merits. Thus, for appellate review, the relevant facts were those most favorable to the plaintiff.

The contract between the builder and the defendant was on a time and materials basis, under which the price of the completed work totalled approximately $13,000. At that time, immediately following World War II, building materials were in short supply, but the federal government administered a program under which veterans could be granted a priority in obtaining materials. The owner had obtained such a priority. He had prepared a form of contract which called for a fixed price of $6,850, plus $1,000 in extras, which the builder signed. That fixed price contract was submitted to the appropriate federal agency. Under the federal statute governing the priority program, the cost to a veteran of a qualifying house could not exceed $10,000. The statute's purpose was price

---

**5.** A subcontractor also joined as a claimant, but that is immaterial for present purposes.

control, in order to protect veterans in obtaining low-price housing.

This Court reversed, in part, the award to the builder, but permitted recovery from the owner of the difference between the amount paid by the owner and the full amount represented to the government as the contract price. *Id.* at 670, 69 A.2d at 482. We said that "[w]hen a transaction involves violation of a statute the clean hands maxim ... is not applied if, by application of the maxim, the legislative purpose would not be furthered, but would be hindered or thwarted." *Id.* at 669, 69 A.2d at 481. Because the owner was "one of a class for whose protection or benefit the statute was enacted, he may be regarded as not *in pari delicto.*" *Id.* In a subsequent memorandum opinion, overruling a motion for reargument, this Court described its holding as "a somewhat novel, though we think sound, application by analogy of principles applied in somewhat different cases." *Id.* at 671, 72 A.2d at 249.

In *Messick*, the *in pari delicto* defense, if applied rigidly, would have resulted in no portion of the unpaid balance being paid under either of the competing contracts. The "novel disposition" applied the doctrine only to the extent necessary to prevent recovery by the plaintiff of the excess over the amount in the contract which had been exhibited to the government. To the extent that this benefitted the defendant, the defendant was viewed as not being of equal fault, because the statutory policy was intended for his benefit.

The per curiam opinion in *Pratt v. Pratt*, 245 Md. 716, 228 A.2d 611 (1967), is also relevant to the issue here. A divorce was denied to the parties in that case because neither had " 'clean hands,' " as the trial judge expressed his ruling. *Id.* at 717, 228 A.2d at 612. The trial court nevertheless granted the wife custody of the children, over the husband's objection that the wife had committed adultery and that, by her own admission, she had perjured herself on the witness stand during the hearing of the divorce case. This Court sustained the custody award, without discussing the perjury. Implicit in the disposition is the recognition that the policy of awarding custody

based on the best interest of the child is a more important policy than denying equitable relief based on perjury in the action.

Under the principle illustrated by the decisions reviewed above, the ultimate question in the case before us is whether any deterrence of perjury that might be effected by refusing relief to Janet is outweighed by the policy favoring the enforcement of agreements for spousal support. Clearly, the answer is "yes." An agreement between a husband and wife that relates to support is expressly recognized as valid and enforceable. Maryland Code (1984, 1991 Repl.Vol.), § 8–101(a) of the Family Law Article (FL). Similar recognition is given to a settlement of support. FL § 8–101(b). Judicial modification may be obtained of an agreement with respect to spousal support executed on or after April 13, 1976, absent an express waiver in the agreement of spousal support and absent an express provision excluding modification. FL § 8–103(c). The General Assembly has clarified that the provisions of a separation agreement incorporated, but not merged, into a divorce decree may be enforced by contempt or as an independent contract. FL § 8–105(a)(2). *See also* J. Fader & R. Gilbert, *Maryland Family Law* § 16.10(c) (1990). Maryland Constitution, Article III, § 38 excepts from the prohibition against imprisonment for debt an "agreement approved by decree of [a court of competent jurisdiction] for the support of a spouse ... or for alimony (either common law or as defined by statute)." The General Assembly has provided a system for the continuing withholding of spousal support from earnings of the obligor. FL §§ 10–120 through 10–136. Maryland has joined with other states in a reciprocal arrangement for the enforcement of support. FL §§ 10–301 through 10–340.

Recognition of a similar policy is illustrated in *DuPont v. DuPont,* 34 Del.Ch. 267, 103 A.2d 234 (Del.1954), a wife's action for separate maintenance and support. In those proceedings the wife had lied about her sources of income prior to her marriage when, in fact, she had "maintained herself for several years on the champagne circuit of New York's cafe

society" by "[e]xercising her charms for the entertainment of men." 103 A.2d at 235. In its order the trial court stated that, because of the wife's perjury, the support actually awarded had been reduced from a substantially larger sum than otherwise would have been awarded. *Id.* The Supreme Court of Delaware reversed. Part of its rationale was the following observation with which we agree:

"While lying under oath is a matter of the very gravest importance in its own right, and is always punishable in proper proceedings, it appears to us to be extraneous to the issue as to how much money this husband should provide for the support of his wife."

*Id.* at 239.

The direct sanction for perjury is prosecution as a criminal offense. Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 435. By Chapter 371 of the Acts of 1991, Art. 27, § 439 was amended to make perjury punishable by imprisonment in the jail "or penitentiary." Uncodified § 2 of Ch. 371 provides that "there is no statute of limitations for a misdemeanor punishable by imprisonment in the penitentiary, notwithstanding any holding or dictum to the contrary in *Massey v. State,* 320 Md. 605, 579 A.2d 265 (1990)." Whether Janet—and Mark—should be prosecuted is a matter committed to the discretion of the State's Attorney for Frederick County.

The allegations of Janet's complaint also raise a factual question whether the degree of her guilt for the perjury in the divorce case is as great as Mark's. Further, the perjury is an accomplished fact. It was limited to the grounds for the divorce which has been granted. In that sense this case is somewhat analogous to *Maskell,* where the former mistress was permitted to seek a partition sale of the place of cohabitation after her relationship with the married man had terminated. 189 Md. at 330, 55 A.2d at 846. Even if Janet's claim to support rests on an agreement that also contemplated perjured grounds for divorce, her claim for support is not as dependent on the perjury as the claim involved in *Kirkland v. Mannis,* 55 Or.App. 613, 639 P.2d 671 (1982). The claim there

was brought pro se by a prisoner at the state penitentiary against the attorney who defended him on charges of rape, sodomy, and kidnapping. The plaintiff contended that the defendant committed legal malpractice " '[b]y unethically manufacturing a story for the defense ... and causing plaintiff to relate same to the court causing the plaintiff to be convicted of the crime charged.' " 639 P.2d at 672. In that case the court held the plaintiff's claim barred by "unclean hands."

We conclude that dismissal of Janet's complaint would do little to discourage perjury in divorce actions. Rather, under the facts alleged, dismissal would be contrary to strong public policy, because dismissal would reward the perjury of economically superior spouses by neutering their contractual obligations of support to economically dependent spouses. The complaint should not have been dismissed.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT, REVERSING THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AND REMANDING THIS CAUSE TO THE CIRCUIT COURT FOR FREDERICK COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT, MARK REYNOLDS SCHNEIDER.*

CHASANOW, Judge, dissenting:

I respectfully dissent because I do not believe that the trial judge erred in denying specific performance of the agreement to pay spousal support. Janet filed a separate action to reopen the divorce proceedings, which was also dismissed—that dismissal was not appealed. The effect of permitting reopening the divorce proceedings would have been to allow her to seek alimony. Janet has abandoned this alternative remedy.

## SPECIFIC PERFORMANCE OF THE CONTRACT
## FOR POST–DIVORCE SPOUSAL SUPPORT

Alimony and post-divorce spousal support are quite different. In appropriate circumstances, a court may award alimony incident to a divorce. *See* Maryland Code (1984, 1991 Repl.Vol., 1993 Cum.Supp.), Family Law Article, § 11–101. Post-divorce spousal support may *not* be granted absent an enforceable contract between the parties. *See Bellofatto v. Bellofatto,* 245 Md. 379, 226 A.2d 313 (1967); *Bebermeyer v. Bebermeyer,* 241 Md. 72, 215 A.2d 463 (1965); *Schroeder v. Schroeder,* 234 Md. 462, 200 A.2d 42 (1964); *Dickey v. Dickey,* 154 Md. 675, 141 A. 387 (1928). Agreements to pay spousal support require consideration to be valid. *See Frank v. Frank,* 203 Md. 361, 101 A.2d 224 (1953). Janet's suit for specific performance alleges she and her husband entered into an enforceable contract that Mark would pay her post-divorce spousal support.

The majority quotes from portions of a four-page longhand letter from Mark to Janet which states in part: "I could send you $400.00 or $500.00 every two week[s] 24 times a year or $10,000.00+ per year as long as you need it or more[.]" The majority then concludes "[t]he theory of the instant complaint is that this portion of the note evidences a contract to pay spousal support." 335 Md. at 504, 644 A.2d at 512 (1994). Mark was correct in contending that the letter was not an enforceable contract. That letter could not evidence a contract to pay spousal support for several reasons. First and foremost, that offer was apparently intended by Mark, and assumed by Janet, also to include support for the parties' son who at the time was still a dependent minor. There is no indication of how much of Mark's payments were to be allocated for child support. In her divorce complaint and at the divorce hearing, Janet acknowledged under oath that there was an agreement between Mark and her that Mark be "charged generally" with their minor son's support. That "agreement" was incorporated into the divorce decree, and Mark was "charged generally with the support of the parties' minor child...." Mark's $400 or $500 every two weeks for

spousal and child support was not a contract to pay a specific sum for spousal support. Second, Mark's letter makes no mention of a divorce and there is no clear indication that the pre-divorce support payments were intended to continue after the divorce and be converted to permanent spousal support. Finally, this letter merely constituted a unilateral indication of what Mark intended to do—there was no consideration or mutual promises by Janet which would make this letter a contract. In the instant case, Mark made a motion to dismiss in which he pointed out that the four-page letter was not a contract and was at best his initial proposal "prior to settlement of marital property disputes...." It was in response to this motion to dismiss that Janet changed her theory of the case and for the first time made the factual allegations that raise the issues now before this Court. If, as the majority concludes, Janet's specific performance action was grounded on a portion of Mark's letter containing a unilateral offer to pay $400 or $500 every two weeks which could have encompassed both spousal and child support, then the trial judge certainly did not abuse his discretion in refusing to enforce this vague, indefinite "contract" to pay spousal support. This "contract" also lacked any consideration on Janet's part. In her answer to Mark's motion to dismiss, Janet did, however, indicate that subsequent to this letter she and Mark had more specific contractual negotiations.

The primary issue raised on appeal revolves around the pleading filed by Janet in response to Mark's motion to dismiss. It is in that pleading that Janet alleges she was "dominated" by Mark and that she complied with Mark's suggestion that she obtain a divorce because she was oppressed by Mark. The majority quotes extensively from that pleading which formed the basis of Janet's defense to Mark's motion to dismiss. In that same pleading, Janet claims Mark contracted to pay spousal support and she acknowledges the following:

"The consideration for the [contract to pay spousal support] was that Plaintiff [Janet] would prosecute a divorce action in

the Circuit Court for Frederick County in which she would make no claims for any form of financial relief. Plaintiff complied with her obligations under the parties' agreement."

The trial judge quite properly recognized that seeking a fraudulent divorce through perjured testimony constituted part of the consideration for the alleged spousal support agreement. The other part of the consideration was foregoing any claim for alimony in the fraudulent divorce action. The Court of Special Appeals recognized that the consideration for Mark's contract to support Janet was "(1) *the act of perjury itself* (*i.e.,* the prosecution of the divorce action, which was grounded in adultery), and (2) an act that occurred as a *direct result* of said perjury (*i.e.,* in the divorce action, her making no claim for any form of financial relief)." *Schneider v. Schneider,* 96 Md.App. 296, 308, 624 A.2d 1319, 1326 (1993) (emphasis in original). There can be no question but that a contract based on the consideration that the promisee will obtain a divorce, to which the parties are not entitled, and will do so by committing and suborning perjury, is an illegal contract. Promising not to include a claim for alimony in an improperly obtained divorce is a part of the illegality. Janet sought one of two alternative remedies based on this illegal contract. She was primarily seeking to obtain the full benefit of her illegal bargain. She wanted Mark to pay her contractual spousal support for the rest of her life. This is the relief the majority feels Janet is entitled to if she can prove "oppression" or "great disadvantage." Her alternative request, which was not pursued on appeal, was to reopen the divorce so she could have made a claim for alimony.

If Janet is *in pari delicto* in the illegal contract, the majority recognizes she is not entitled to any contractual relief. If she is not *in pari delicto,* she may be entitled to some relief.

"A plaintiff is not regarded as *in pari delicto* with the defendant, if, even though he knew or had reason to know that the bargaining was illegal or immoral, he was induced to participate in it by fraud or duress or by the use of

influence derived from superior knowledge, mental power, or economic position."

6A Arthur L. Corbin, *Corbin on Contracts* § 1537, at 826 (1962).

Janet claims she is not *in pari delicto,* and her choice of relief is specific performance, which would give her the full benefit of her illegal bargain. This the majority would allow. Janet's fall back position—which I would agree with—is that if she can prove "oppression" or "great disadvantage," she ought to get restitution, that is, have restored to her what she gave up—the right to present her claim for alimony. Unfortunately, if Janet had any right to reopen the divorce proceedings and seek alimony, she has abandoned that option.

Most of the recognized authorities in the field of contracts indicate that generally the appropriate remedy for a person not *in pari delicto* to an illegal contract is restitution or rescission, not enforcement of the illegal contract. For instance, in Samuel Williston, 14 *A Treatise on the Law of Contracts* § 1631A, at 46–47 (Walter H.E. Jaeger ed., 3d ed. 1972), the commentator made the following observation:

"Even a guilty party, if not thought to be in *pari delicto,* and even an equal participant in the illegality, if public policy demands it, is often allowed relief by way of *restitution or rescission, though not on the contract.*" (Footnotes omitted) (emphasis added).

That treatise also recognizes the following:

"§ 1789. **Parties Not in Pari Delicto.** In some cases *rescission* of an illegal transaction and *recovery of consideration* is allowed beyond the limits stated in the preceding section [which states that there is no restitution for illegal conduct]. This is true where the parties are said not to be *in pari delicto.* The typical case is where one party acts under compulsion of the other." (Footnotes omitted) (emphasis added).

15 Williston, *A Treatise on the Law of Contracts* § 1789, at 357.

"But there are numerous cases in which Restitution will be adjudged even though a judgment for money damages would be refused. The court will say that 'contract' will not be enforced, but that the plaintiff will be permitted to 'rescind' (or to disregard) the contract and will then have a right to his property or money back, or to the reasonable value of a performance rendered by him and received by the defendant."

6A *Corbin on Contracts* § 1535, at 822.

It is interesting to note that none of the illegal contract cases cited by the majority granted specific performance or enforcement of an illegal contract as the appropriate remedy. In all of the illegal contract cases, where the plaintiffs were entitled to relief because they were not *in pari delicto*, the relief was restitution or rescission. *See Cronin v. Hebditch,* 195 Md. 607, 74 A.2d 50 (1950); *Maskell v. Hill,* 189 Md. 327, 55 A.2d 842 (1947); *Lord v. Smith,* 109 Md. 42, 71 A. 430 (1908); *Du Pont v. Du Pont,* 103 A.2d 234 (Del.1954).

*Messick v. Smith,* 193 Md. 659, 69 A.2d 478 (1949) is a case cited and relied on by the majority. In *Messick,* the plaintiff builder sought and recovered in the lower court the full amount due under an illegal "time and material" contract he had with the defendant. This Court apparently recognized that the parties were not *in pari delicto* but, nevertheless, limited plaintiff's recovery by not allowing the plaintiff the full benefit of his bargain, or even the cost of construction. The plaintiff was only allowed to recover the amount which he falsely represented to the government was the contract price. I would also rely on the cases cited by the majority permitting recovery where there was an illegal contract because the parties were not *in pari delicto,* but all of those cases permitted only restitution or rescission. The majority does not cite a single case which permits specific performance of an illegal contract in circumstances such as the instant case.

The trial judge did not abuse his discretion in refusing the equitable remedy of specific performance. It was not an abuse of discretion for the trial judge to refuse to require

Mark to pay post-divorce spousal support to Janet for the rest of her life merely because she kept her part of the bargain and obtained a fraudulent divorce by perjuring herself and suborning the perjury of a corroborating witness. As this Court has stated:

> "A court of equity will not require specific performance [of a separation agreement] as a matter of course. It will evaluate the conduct of the parties, the circumstances and the equities of each particular case. It will not use its discretion to grant the remedy unless its exercise will subserve the ends of justice and the result of its assistance is fair, just and reasonable."

*Zouck v. Zouck,* 204 Md. 285, 296, 104 A.2d 573, 577–78, 105 A.2d 214 (1954). Specific performance could properly have been denied either because there were insufficient allegations of an enforceable contract or because this spousal support contract, founded upon illegal consideration, should not be specifically enforced in an equity court.

If Janet establishes there was a contract and she was not *in pari delicto* because of oppression or great disadvantage, she may have been entitled to relief by way of restitution—to have restored what she gave up, *i.e.,* her claim for alimony. She should not be entitled to reap the full benefit of her illegal bargain. A bargain conditional, even in part, on obtaining a perjured divorce is not a bargain that ought to be enforced by a court of equity. I respectfully dissent.